FILED UNDER SEAL

# EXHIBIT 2



## [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>　　　　　　　　　　　　　　　　　　　　　Mon, Apr 24, 2023 at 8:32 PM
To: Jay Edelson <jedelson@edelson.com>, "ewadescott@edelson.com" <ewadescott@edelson.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>
Cc: "Richlin, Eli" <erichlin@wsgr.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>

Counsel,

We'd like to meet and confer concerning a possible negotiated resolution to your motion for jurisdictional discovery. Are you available for a short call tomorrow?

Best,

Paul



**Paul C. Gross | Litigation Associate | Wilson Sonsini Goodrich & Rosati**
1301 Avenue of the Americas | New York, NY 10019 | direct: 212.497.7787 | mobile: 703.864.8912 | pgross@wsgr.com

🌐  👤  in  🐦  f

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Eli Wade-Scott** <ewadescott@edelson.com>　　　　　　　　　　　　　　　　　　Mon, Apr 24, 2023 at 8:42 PM
To: "Gross, Paul" <pgross@wsgr.com>
Cc: "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, Jay Edelson <jedelson@edelson.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

> Sure. I'm in a mediation but should be able to find a few minutes. Can we aim for 1 ET?
>
> [Quoted text hidden]
> --



**J. Eli Wade-Scott**
350 N LaSalle St, 14th Floor, Chicago, IL 60654
d 312.242.0859 · t 312.589.6370 · edelson.com

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Jay Edelson** <jedelson@edelson.com>　　　　　　　　　　　　　　　　　　　　Mon, Apr 24, 2023 at 8:43 PM
To: "Gross, Paul" <pgross@wsgr.com>
Cc: "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>, "ewadescott@edelson.com" <ewadescott@edelson.com>

> Sure. What time?
>
> On Mon, Apr 24, 2023 at 8:33 PM Gross, Paul <pgross@wsgr.com> wrote:
> [Quoted text hidden]
> --

**Jay Edelson**
350 N LaSalle St, 14th Floor, Chicago, IL 60654
d 312.589.6375 · t 312.589.6370 · edelson.com

🎙 Non-Compliant · @JayEdelson (Twitter · LinkedIn)

2

3

## [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>  Mon, Apr 24, 2023 at 8:52 PM
To: Eli Wade-Scott <ewadescott@edelson.com>
Cc: "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, Jay Edelson <jedelson@edelson.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

1 p.m. Eastern looks promising.  I'll send an invite – just shoot us an email if you need to change, we'll do the same.

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>                                        Thu, Apr 27, 2023 at 12:47 PM
To: Jay Edelson <jedelson@edelson.com>
Cc: "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>, "ewadescott@edelson.com" <ewadescott@edelson.com>

Jay,

I am following up on our Tuesday discussion. As we agreed, the information provided here is marked "confidential" pursuant to any protective order that may be entered in this case and shall be treated consistent with standard protective orders (e.g., the ND Cal model) in the meantime. As such, please provide reasonable notice before including any of this confidential information in a public filing, so that we have an opportunity to make a sealing application.

DoNotPay has authorized the following information proffer, which is based on information collected from DoNotPay's third party payment processor: Since founding, DoNotPay ("DNP") has had approximately 217,700 total subscribers. I am informed that DNP does not collect residency data on its subscribers, but conservatively estimates that 15% (32,655) are California residents. This estimate is based on the fact that (i) approximately 12% of the US population resides in California; and (ii) DNP was founded in, and received significant local media attention in, California – making it likely that at least some disproportionate volume of DNP subscribers (indeed, likely in excess of the conservative estimate used here) are California residents.

In your papers, you "assum[e], for the sake of argument, that all users . . . would have paid $381." ECF No. 18 at 4-5. Recognizing that your assumption is a liberal one, we reduce that assumed number by *half*, such that the estimated California subscribers are each assumed to have paid $190.50. Even under that more conservative assumption, though, the total restitution amount available to the proposed class would be **$6,220,777.50**. When combined with the effect of injunctive relief and potential legal costs, these calculations support the position that the amount in controversy here easily exceeds CAFA's jurisdictional threshold. *See Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019) ("The amount in controversy reflects the *maximum* recovery the plaintiff could reasonably recover . . . [a]n assertion that the amount in controversy exceeds the jurisdictional threshold is not defeated merely because it is equally possible that damages might be 'less than the requisite ... amount'") (emphasis in original)(citation omitted).

If necessary, DNP is prepared to provide a Declaration to this effect from its Vice President of Product, Andrew Kim as part of a deal to resolve your motion for jurisdictional discovery.

In light of this information, please confirm that you will withdraw the motion. I will add as well that having proffered this information, it's not clear to us what basis you would have to depose Mr. Browder (the company's CEO) at this stage, as at a minimum there are far less burdensome ways to provide the relevant information.

If you will not withdraw your motion, and DNP is forced to respond, I want to make sure I provide the Court with an accurate representation of our prior correspondence.

> 1. In your motion, you state that "Counsel for the Plaintiff emailed Defendant's Counsel to correct the legally insufficient contentions in their Notice of Removal. As of the date of this filing, they have not removed these." ECF No. 18 at 2, n.1. I do not recall any communication requesting that DNP "correct" anything in its Notice of Removal. If I am missing such an email, could you please direct me to it?

5

2. During our meet and confer, I understood you to be saying that, prior to filing your motion for jurisdictional discovery, Plaintiff's counsel had emailed defense counsel (i) to advise us that you would be making a motion for jurisdictional discovery; and (ii) to discuss alternatives to a deposition of Mr. Browder.  Again, I do not recall receiving such an email.  If I am missing it, or if I misunderstood your statements during our conference, please advise.

Best,
Paul

## [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Eli Wade-Scott** <ewadescott@edelson.com>   Thu, Apr 27, 2023 at 3:23 PM
To: "Gross, Paul" <pgross@wsgr.com>
Cc: Jay Edelson <jedelson@edelson.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

Thanks, Paul.  A few initial reactions:

1.  It is not particularly cred ble to us that DoNotPay isn't collecting addresses, IP addresses, or other geographic information from its customers.  As you know, we are concerned with the company's slipperiness generally. In the end, tech companies have geographic information, as it's fairly crucial to their business—particularly as DoNotPay is not available in all locations. I could imagine that your clients are saying something like "oh yeah; we have everyone's addresses but who knows? Maybe some of the people no longer 'reside' in that home." Could you clarify or perhaps send the draft affidavit so we can pay close attention to the language?

2.  On the issue of the amount of money collected from DoNotPay, we have similar questions. Why are you speculating, when DoNotPay absolutely knows what the average subscr ber pays, how much they have collected in total, and certainly knows an approximation of how much its California subscribers actually paid? There's no reason to work off of our calculations in the brief, which were meant to (as best as we could) prove a negative—assuming that every subscriber was paying the maximum amount for the entire existence of DoNotPay, which just doesn't make sense if you're trying to make an affirmative case.

3. On the same theme, DoNotPay should use information it knows rather than making assumptions about the percentage of subscribers, because the assumptions you've made in your calculations also ignore even publicly-available information. First, in assuming that 15% of all consumers over the company's existence were in California, you've relied entirely upon the U.S. population and ignored the company's U.K. subscribers. Second, it appears that DoNotPay's services were only available in the U.K., New York, and Washington State until July 2017, during which time it would have had no California subscribers. There has to be some more credible way of estimating the California subscriber base.

4.  Your proffer doesn't even mention where DoNotPay is located. Again, we aren't willing to depend on the company's word that it is run out of an Aspen ski home. We made clear, on our meet and confer, that we think this assertion is especially not credible, and when we pressed you on it, you said that you were just getting information from the client—making clear that you didn't personally stand behind this. The fact that you now omit this entirely demonstrates, consistent with our instinct, that this representation is not an actionable statement for purposes of jurisdiction. (If you do stand behind this, please clarify and set forth the basis for that).

5. Why would the Vice President of Product be the relevant declarant? The reason we've asked for Mr. Browder's deposition is that, by all accounts, DoNotPay isn't a giant company with well-delegated knowledge about the questions we've asked. Browder is no doubt the only person that knows the answers to all of these questions about where the company is, how much money it makes, and how many subscr bers there are. There is no reason to think that a person tasked with the DoNotPay product's function (or lack thereof) is the relevant person for jurisdictional discovery.

Finally, when we had our meet and confer earlier this week, we raised the fact that the company's response when we've previously asked for information has been to completely dodge and dismiss those requests. (See our e-mails of April 10 and 12th, and your responses to them.) We said that we weren't going to hold that against you or try to involve the Court in it, but that we wanted to work cooperatively with you—which we are still trying to do. But we expressed our hope that you would act cooperatively in turn. This, unfortunately, feels like more of the same. Nevertheless, we look forward to your response.

Best,

Eli
[Quoted text hidden]
--

**Edelson** PC

**J. Eli Wade-Scott**
350 N LaSalle St, 14th Floor, Chicago, IL 60654
d 312.242.0859 · t 312.589.6370 · edelson.com

---

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>                                              Mon, May 1, 2023 at 10:27 AM
To: Eli Wade-Scott <ewadescott@edelson.com>
Cc: Jay Edelson <jedelson@edelson.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

Eli,

Thanks.  We are reviewing your questions and will revert soon.  As a heads up, and in order to preserve our client's rights, we intend to file our opposition to your motion for leave to conduct jurisdictional discovery today.  Still, we are open to continued negotiation in hopes that the parties will be able to reach agreement without the need for the Court's intervention.

Best,

Paul

7

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>                                               Fri, May 5, 2023 at 10:30 AM
To: Eli Wade-Scott <ewadescott@edelson.com>
Cc: Jay Edelson <jedelson@edelson.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

Eli,

Following up on the below.

First, in the ordinary course of its business, DoNotPay does not collect addresses from its customers. That is easily confirmable – just go through the sign up flow to create a DoNotPay account, there is no field for a customer's address (or even for a ZIP code). As you know, IP addresses are not a reliable proxy for residency. DoNotPay has no way of knowing if its users are logging in through VPNs, public wifi, or any other system that might obscure a user's residency. Accordingly, DoNotPay cannot derive any reliable estimate of the number of California subscribers from its records as they are maintained in the ordinary course of business.

Nor can DoNotPay rely upon what it knows about its own revenue to render an estimate of what the average California subscriber has paid. Of course, as you note, DoNotPay knows its total subscription revenue. As that figure is commercially sensitive, I am not authorized to share it with you at this stage. But I am authorized to inform you, and can personally confirm, that DoNotPay's total revenue *far* exceeds $5 million, which means that the maximum potential recovery suffices for CAFA's jurisdictional threshold.

As further support for the validity of removal, DoNotPay estimates that about 15% of its total subscribers are California residents (again, a conservative assumption) and we multiply the size of the putative class against 50% of your assumption as to the average fees paid per customer, and that method of estimation likewise exceeds the jurisdictional minimum amount. These are reasonable assumptions and they are consistent with what DoNotPay knows about the size of its total subscriber base, and the likelihood that California users represent at least a somewhat disproportionate share of its subscriber base. These assumptions also satisfy DoNotPay's burden to demonstrate subject matter jurisdiction under CAFA. *See Jauregui v. Roadrunner Transportation Servs., Inc.,* 28 F.4th 989, 993 (9th Cir. 2022) ("a CAFA defendant's amount in controversy assumptions in support of removal will always be just that: *assumptions*. At that stage of the litigation, the defendant is being asked to use the plaintiff's complaint—much of which it presumably disagrees with—to estimate an amount in controversy") (emphasis in original).

Second, while we understand your position regarding injunctive relief (that you will not consider the value of injunctive relief in evaluating amount in controversy), we do not think the *Court* is likely to agree with that position. If you are successful in obtaining your requested injunction, DoNotPay may be obligated to undergo the burdensome process of evaluating each and every one of its offerings to determine if they are covered the by the injunction (which may require retaining attorneys or consultants) and implement appropriate changes. The changes that are appropriate may also vary by state – as states may define the practice of law differently. All of this would be expensive, and would certainly be considered by the Court in evaluating amount in controversy. Moreover, DoNotPay may lose revenue associated with its to-be-enjoined offerings, further raising the amount in controversy.

Third, at the time this lawsuit was filed, and at the time of removal, DoNotPay's principal place of business was (and still is) in Aspen, Colorado. The type of building from where the business is managed is immaterial. We have been unequivocal in that position, which has also been confirmed in a sworn statement to the Colorado Department of State. Notably, you have not presented a basis to conclude that the business was run from California – the only state that would

destroy CAFA's required "minimal" diversity.  As an additional proffer, attached hereto are documents demonstrating that DoNotPay's former San Francisco office ceased operations in early 2022.  In particular, we attach evidence that DoNotPay's SF office cancelled its internet subscription and that its utility bill declined precipitously in early 2022.

The bottom line is that DoNotPay believes that it has sufficiently demonstrated federal jurisdiction under both CAFA and traditional diversity jurisdiction already.  DoNotPay does not agree to produce Mr. Browder for a deposition and, for the reasons explained in our papers, we do not believe the Court is l kely to order Mr. Browder to sit for a deposition either.  In the alternative, we have proffered otherwise confidential information and proposed providing a sworn Declaration from a high level employee with personal knowledge of the relevant facts.  We encourage you to consider accepting that or otherwise let us know whether you have any alternative proposal short of a deposition of our client's chief executive.

Best,

Paul

[Quoted text hidden]
[Quoted text hidden]

**2 attachments**

**Account Settings _ Google Fiber Webpass - Gigabit & High-Speed Internet.pdf**
140K

**document (1).pdf**
305K

3/21/23, 12:52 PM                     Account Settings | Google Fiber Webpass - Gigabit & High-Speed Internet

 Google Fiber Webpass                                                                Logout

- Home
- Billing
- Service Plan
- **Account Settings**
- Support
- Usage Graphs

## Account Settings

Manage your personal and account info below.

| | |
|---|---|
| ACCOUNT HOLDER NAME | DoNotPay |
| COMPANY NAME | DoNotPay |
| PHONE | 702-427-0470 (phone) |
| EMAIL | joshua@donotpay.com (billing) (technical) |
| PASSWORD | ******** |

**Update account settings**

## Events history

| Date | Type | Title & Description |
|---|---|---|
| 05/25/2022 | Disconnect Completed | Disconnect completed for subscription #127282 |
| 05/11/2022 | Disconnect Request | Disconnect requested for subscription #127282 at 164 Townsend St #2 on 2022-05-11 |
| 01/10/2022 | Customer Notification | Maintenance notification successfully sent to joshua@donotpay.com |
| 12/27/2021 | Customer Notification | Maintenance notification successfully sent to |

https://webpass.net/portal/account_settings                                                               1/2

10





# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 2340074477-9
Statement Date: 07/03/2022
Due Date: **07/20/2022**

**Service For:**

DO NOT PAY INC
164 TOWNSEND ST UNIT 2
SAN FRANCISCO, CA 94107

**Questions about your bill?**

Mon-Fri 7 a.m.-7 p.m.
Saturday 8 a.m.-5 p.m.
Phone: 1-800-743-5000
www.pge.com/MyEnergy

**Ways To Pay**

www.pge.com/waystopay

**Your Account Summary**

| | |
|---|---:|
| Amount Due on Previous Statement | $1,820.08 |
| Payment(s) Received Since Last Statement | 0.00 |
| Previous Unpaid Balance | $1,820.08 |
| CAPP Credit | -$5.29 |
| **Total Amount Due** by 07/20/2022 | **$1,814.79** |



Electric Monthly Billing History

**Important Messages**

You received a California Arrearage Payment Plan (CAPP) credit on your energy statement. California established The CAPP credit to help customers with past due energy bills accrued during the COVID-19 pandemic. For additional information please visit www.csd.ca.gov.

**Thank you for your timely payments** For the last 12 months, you've had an excellent payment record and received no delinquent notice. If you need to establish credit at another utility, you may use this message as a credit reference.

---

Please return this portion with your payment. No staples or paper clips. Do not fold. Thank you.

99902340074477900000000000000181479



| Account Number: | Due Date: | Total Amount Due: | Amount Enclosed: |
|---|---|---|---|
| 2340074477-9 | 07/20/2022 | $1,814.79 | $ |

DO NOT PAY INC
164 TOWNSEND ST
SAN FRANCISCO, CA 94107-1989

PG&E
BOX 997300
SACRAMENTO, CA 95899-7300

Page 1 of 3



# ENERGY STATEMENT
www.pge.com/MyEnergy

Account No: 2340074477-9
Statement Date: 07/03/2022
Due Date: 07/20/2022

## Important Phone Numbers - Monday-Friday 7 a.m.-7 p.m., Saturday 8 a.m.-5 p.m.

**Customer Service (All Languages; Relay Calls Accepted) 1-800-743-5000**
**TTY 7-1-1**

| | | | |
|---|---|---|---|
| Servicio al Cliente en Español (Spanish) | 1-800-660-6789 | Dịch vụ khách tiếng Việt (Vietnamese) | 1-800-298-8438 |
| 華語客戶服務 (Chinese) | 1-800-893-9555 | Business Customer Service | 1-800-468-4743 |

### Rules and rates

You may be eligible for a lower rate. Find out about optional rates or view a complete list of rules and rates, visit www.pge.com or call 1-800-743-5000.

**If you believe there is an error on your bill, please call 1-800-743-5000** to speak with a representative. If you are not satisfied with our response, contact the California Public Utilities Commission (CPUC), Consumer Affairs Branch (CAB), 505 Van Ness Avenue, Room 2003, San Francisco, CA 94102, 1-800-649-7570 or 7-1-1 (8:30 AM to 4:30 PM, Monday through Friday) or by visiting www.cpuc.ca.gov/complaints/.

To avoid having service turned off while you wait for the outcome of a complaint to the CPUC specifically regarding the accuracy of your bill, please contact CAB for assistance. If your case meets the eligibility criteria, CAB will provide you with instructions on how to mail a check or money order to be impounded pending resolution of your case. You must continue to pay your current charges while your complaint is under review to keep your service turned on.

**If you are not able to pay your bill,** call PG&E to discuss how we can help. You may qualify for reduced rates under PG&E's CARE program or other special programs and agencies may be available to assist you. You may qualify for PG&E's Energy Savings Assistance Program which is an energy efficiency program for income-qualified residential customers.

### Important definitions

**Rotating outage blocks** are subject to change without advance notice due to operational conditions.

**Demand charge:** Many non-residential rates include a demand charge. Demand is a measurement of the highest usage of electricity in any single fifteen (or sometimes five) minute period during a monthly billing cycle. Demand is measured in kilowatts (or kW). High demand is usually associated with equipment start-up. By spreading equipment start-ups over a longer period of time, you may be able to lower demand and reduce your demand charges.

**Time-of-use electric** prices are higher every day during afternoons and evenings, and lower at other times of the day. Prices also change by season, with higher prices in the summer and lower prices in the winter.

**Wildfire Fund Charge:** Charge on behalf of the State of California Department of Water Resources (DWR) to fund the California Wildfire Fund. For usage prior to October 1, 2020, this charge included costs related to the 2001 California energy crisis, also collected on behalf of the DWR. These charges belong to DWR, not PG&E.

**Power Charge Indifference Adjustment (PCIA):** The PCIA is a charge to ensure that both PG&E customers and those who have left PG&E service to purchase electricity from other providers pay for the above market costs for electric generation resources that were procured by PG&E on their behalf. 'Above market' refers to the difference between what the utility pays for electric generation and current market prices for the sale of those resources. Visit www.pge.com/cca.

**Wildfire Hardening Charge:** PG&E has been permitted to issue bonds that enable it to recover more quickly certain costs related to preventing and mitigating catastrophic wildfires, while reducing the total cost to its customers. Your bill for electric service includes a fixed recovery charge called the Wildfire Hardening Charge that has been approved by the CPUC to repay those bonds. The right to recover the Wildfire Hardening Charge has been transferred to a separate entity (called the Special Purpose Entity) that issued the bonds and does not belong to PG&E. PG&E is collecting the Wildfire Hardening Charge on behalf of the Special Purpose Entity.

**Recovery Bond Charge/Credit:** Your bill for electric service includes a charge that has been approved by the CPUC to repay bonds issued for certain costs related to catastrophic wildfires. Separately, a PG&E trust provides a customer credit equal to the charge for customers. Visit www.pge.com/billexplanation for additional details on charge item.

**Gas Public Purpose Program (PPP) Surcharge.** Used to fund state-mandated gas assistance programs for low-income customers, energy efficiency programs, and public-interest research and development.

Visit www.pge.com/billexplanation for more definitions. To view most recent bill inserts including legal or mandated notices, visit www.pge.com/billinserts.

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. © 2022 Pacific Gas and Electric Company. All rights reserved.

---

Please do not mark in box. For system use only.

### Update My Information (English Only)

Please allow 1-2 billing cycles for changes to take effect

**Account Number: 2340074477-9**

Change my mailing address to: _____

City _____ State ____ ZIP code _____
Primary Phone _____  Primary Email _____

### Ways To Pay

- **Online** via web or mobile at www.pge.com/waystopay
- **By mail:** Send your payment along with this payment stub in the envelope provided.
- **By debit card, Visa, MasterCard, American Express, or Discover:** Call 877-704-8470 at any time. (Our independent service provider charges a fee per transaction.)
- **At a PG&E payment center or local office:** To find a payment center or local office near you, please visit www.pge.com or call 800-743-5000. Please bring a copy of your bill with you.

Page 2 of 3



| ls of El | Charges |
|---|---|
| ervice or:    OWN   ND    UN | |
| ervice greement ID:   5828378 | |
| **Adjust        ts** | |
| Credit | -$5.2 |
| **Adjust        ts** | **-$** |

14

FILED UNDER SEAL

15

## [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Jay Edelson** <jedelson@edelson.com>  Fri, May 5, 2023 at 1:42 PM
To: "Gross, Paul" <pgross@wsgr.com>
Cc: Eli Wade-Scott <ewadescott@edelson.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

Paul,

Thank you for your email.  Let me try to respond point by point, with suggestions interspersed.

1.  IPs as a foolproof determination for residency

We concede that IPs are not proof positive of residency.  However, they are a very good proxy.  What we are having a hard time grappling with is how to evaluate that your claim that 15% of DNP's subscribers are in California.  Simply looking at the relative population of California as compared to the country more generally and then adding 20% because it got some local news coverage doesn't seem scientifically sound.  This is so for many reasons, as we pointed out, including that DNP operated in England, a fact that you did not address in your response.  As we said on the phone, if the total revenue numbers are high, then we would agree the issue is moot. If they aren't, then looking at IP data would be much more useful than your approach.  That brings us to the next point.

2.  You are not providing us with revenue numbers

We don't understand your refusal to provide us with revenue numbers.  We have made clear that we are willing to keep them confidential until a protective order is in place.  We also told you on the phone that if you just gave us a general estimate, that could resolve the issue.  (For example, if the US revenue was, say, $100m through the years, we would agree that the Court has jurisdiction and would not need to press further.).  Instead, you are refusing to produce the key facts in question and instead engaging in a series of guesswork.  We ask that you reconsider your position and provide us the actual numbers (if not for California, at least for the US).

3.  The injunctive relief

We are confused by your position.  As an initial matter, you talk about the expense of doing a state by state analysis, even though our class is limited to California.  Second, Josh has said very publicly that he was abandoning all of the legal work DoNotPay was doing.  Even though he apparently backtracked on that (with his "one click lawsuits"), this suggests he already did the analysis.  More broadly, it's hard to imagine that his lawyers did not already do this analysis prior to launching the site.  Regardless, you do not attempt to put any dollar value on the cost of the injunctive relief or the loss of revenues.

4.  Principal Place of Business

We believe that DNP operates out of wherever Josh is living at the time, which, at the time of filing, appears not to be in Colorado.  I have never seen anyone try to establish a principal place of business by showing their internet and energy bills, but let me suggest something.  Perhaps you could tell us the following:

- Where are each of the "7" DNP employees located?  (We put "7" in quotes, because we have not been able to confirm that.)
- What are the internet and energy bills for Colorado and New York?
- Are you representing that Josh has not said that the company's principal place of business was in California during the relevant time period (i.e. after you claim it moved to Colorado)?

To be clear, we view this issue as a minor one and would be satisfied if you just provided a bit more context.

5.  Jurisdictional discovery

As I said on the phone, we have no special need to depose Josh.  We picked him because he seems to be the only person with relevant knowledge.  (Indeed, even the internet bill was going directly to his email address.).  This is not a

situation where Josh is running a very large company, where the "apex" deponent rule really comes into play. Nevertheless, we are happy to just notice a 30(b)(6) deposition and DNP can pick an appropriate person.

6. Summary

We present you with several options:

1. Provide the US revenue numbers, which could end the whole debate as to the amount in controversy.
2. If the US revenue numbers are not sufficiently high, provide a better breakdown of the CA associated revenue. (Again, we suggest using IP addresses.)
3. Provide some more context on the principal place of business so we can put that to the side.
4. If all else fails, put up a 30(b)(6) deponent.

Best,

Jay

**Edelson** PC

**Jay Edelson**
350 N LaSalle St, 14th Floor, Chicago, IL 60654
d 312.589.6375 · t 312.589.6370 · edelson.com

Non-Compliant · @JayEdelson (Twitter · LinkedIn)

[Quoted text hidden]

17

### [Ext] Faridian v. DoNotPay, Motion for Jurisdictional Discovery

**Gross, Paul** <pgross@wsgr.com>  Mon, May 8, 2023 at 1:35 PM
To: Jay Edelson <jedelson@edelson.com>
Cc: Eli Wade-Scott <ewadescott@edelson.com>, "Bish, Dale" <DBish@wsgr.com>, "Fellows, Allie" <afellows@wsgr.com>, "Richlin, Eli" <erichlin@wsgr.com>, "epenkowski@edelson.com" <epenkowski@edelson.com>

Jay,

Thanks for the response and the suggestions, we appreciate them. We will confer with our client about these (and what other additional information might be available) and will be back to you.

Paul