1  Rafey Balabanian (SBN 315962)
   rbalabanian@edelson.com
2  EDELSON PC
   150 California Street, 18th Floor
3  San Francisco, CA 94111
   Tel: 415.212.9300
4  Fax: 415.373.9435
5
   Jay Edelson (*pro hac vice*)
6  jedelson@edelson.com
   J. Eli Wade-Scott (*pro hac vice*)
7  ewadescott@edelson.com
   Emily Penkowski Perez (*pro hac vice*)
8  epenkowski@edelson.com
   EDELSON PC
9  350 North LaSalle Street, 14th Floor
   Chicago, Illinois 60654
10 Tel: 312.589.6370
   Fax: 312.589.6378
11
12 *Attorneys for Plaintiff and the Proposed Class*
13
14
15                    **UNITED STATES DISTRICT COURT**
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16                       **SAN FRANCISCO DIVISION**

17 JONATHAN FARIDIAN, individually and on        Case No.: 3:23-cv-01692-JD
   behalf of all others similarly situated,
18                                                **PLAINTIFF'S RESPONSE TO**
                   *Plaintiff*,                   **DEFENDANT'S MOTION TO COMPEL**
19                                                **ARBITRATION**
20         *v.*
                                                  Date: July 27, 2023
21 DONOTPAY, INC., a Delaware corporation,        Time: 10:00 a.m.
                                                  Judge: Hon. James Donato
22                 *Defendant*.                   Courtroom: 11, 19th Floor
23
                                                  Date Action Filed: March 3, 2023
24                                                Date of Removal: April 7, 2023
25
26
27
28

## TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................2

    I.     DoNotPay has failed to provide evidence of what the Sign Up Screens actually looked like ................................................................................................2

    II.    DoNotPay has no evidence that Plaintiff viewed the Terms and Conditions ...5

    III.   The Terms and Conditions (until very recently) did not display the arbitration clause prominently ................................................................................................5

    IV.   When asked about the process for opting out, DoNotPay's declarant was unable to confirm that DoNotPay actually received such opt out requests and robotically recited a rehearsed line fourteen times ...........................................6

LEGAL STANDARD ...................................................................................................6

ARGUMENT ................................................................................................8

    I.     DoNotPay has not provided evidence to support its motion ...............................8

    II.    DoNotPay cannot enforce a purported contract to which Plaintiff never agreed ................................................................................................9

        A.    *DoNotPay has taken an aggressive public position against arbitration, and its users would have no reason to expect that DoNotPay itself had a difficult-to-find arbitration clause* ...........................................................9

        B.    *DoNotPay's Sign Up Screens do not give users reasonably conspicuous notice of its Terms* ...................................................................11

        C.    *DoNotPay's Sign Up Flow does not show manifest assent to its Terms* ................................................................................................14

CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)............................................................................................7

**United States Appellate Court Cases**

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ..................................................... *passim*

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53 (1st Cir. 2018)..........................................................1, 12

*In re Ring LLC Priv. Litig.*,
    No. 21-55872, 2022 WL 3339845 (9th Cir. Aug. 3, 2022) ...............................13

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)..........................................................14

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014)  ....................................................7, 9, 11, 13

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) .....................................................6, 7, 13

**United States District Court Cases**

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017)..........................................................12

*Burger v. Northrop Grumman Sys. Corp.*,
    No. 2:21-cv-06761 AB (MRWx), 2021 WL 8322270 (C.D. Cal. Oct. 27, 2021) ..............8

*Colgate v. JUUL Labs, Inc.*,
    402 F. Supp. 3d 728 (N.D. Cal. 2019) .................................................1, 13, 14

*Hill v. Quicken Loans Inc.*,
    No. ED CV 19-0163 FMO (SPx), 2020 WL 5358394 (C.D. Cal. Aug. 5, 2020)...............7

*Hooper v. Jerry Ins. Agency, LLC*,
    No. 22-CV-04232-JST, 2023 WL 3992130 (N.D. Cal. June 1, 2023) .............................13

*In re Ring LLC Priv. Litig.*,
    No. CV 19-10899-MWF (RAOx), 2021 WL 2621197 (C.D. Cal. June 24, 2021) ...........13

*In re Uber Text Messaging*,
    No. 18-CV-02931-HSG, 2019 WL 2509337 (N.D. Cal. June 18, 2019)............................8

*Lopez v. Terra's Kitchen, LLC,*
    331 F. Supp. 3d 1092 (S.D. Cal. 2018)...............................................................7

*Peter v. DoorDash, Inc.,*
    445 F. Supp. 3d 580 (N.D. Cal. 2020) ...............................................................13

*Pizarro v. QuinStreet, Inc.,*
    No. 22-CV-02803-MMC, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) .......................12

*Snow v. Eventbrite, Inc.,*
    No. 3:20-CV-03698-WHO, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020.........................8

*Snow v. Nectar Brand, LLC,*
    No. 2:22- cv-07912-MCS-MRW, 2023 WL 2558544 (C.D. Cal. Mar. 2, 2023) ..............12

*Vrugtman v. It's Just Lunch Int'l LLC,*
    No. EDCV 20-2352 JGB (SPx), 2021 WL 4979443 (C.D. Cal. Sept. 24, 2021) ...............7

**State Court Cases**

*Sellers v. JustAnswer LLC,*
    73 Cal. App. 5th 444 (2021) ...........................................................1, 7, 12, 14

**Miscellaneous Authority**

@jbrowder1, Twitter, (Apr. 24, 2021),
    https://twitter.com/jbrowder1/status/1386052673833627649 ...........................6

@jbrowder1, Twitter, (June 3, 2022),
    https://twitter.com/jbrowder1/status/1532895192596025344 .........................10

9 U.S.C. § 1 ........................................................................................6

Cal. Bus. & Prof. Code § 17602 .............................................................14

Fed. R. Civ. P. 56 ................................................................................8

Home Page,
    DoNotPay.com, https://donotpay.com (last accessed June 23, 2023) .............................5

Jon Porter, *This 'robot lawyer' can take the mystery out of license agreements*,
    The Verge (Nov. 20, 2019), https://www.theverge.com/2019/11/20/20973830/robot-lawyer-
    donotpay-ai-startup-license-agreements-sign-arbitration-clauses ......................................10

Law Insider, *Robinhood's Customer Service Agreements w/ Joshua Browder*,
    YouTube (Feb. 3, 2021), https://www.youtube.com/watch?v=psHiyAtoDd8 ..............2, 9

Paul Sawers, *DoNotPay's Legal Bots Help Consumers Fight the System During Lockdown*,
    VentureBeat (June 23, 2020), https://venturebeat.com/ai/donotpays-legal-bots-help-
    consumers-fight-the-system-during-lockdown ...............................................9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Terms of Service and Privacy Policy,
DONOTPAY.COM, https://donotpay.com/learn/terms-of-service-and-privacy-policy/ (last
accessed June 23, 2023) ......................................................................................................5

Defendant DoNotPay bears the burden of proof on its Motion to Compel Arbitration. It has rested that entire factual burden on the shoulders of its Vice President of Product, Andrew Kim. But with the benefit of discovery, it has become clear that Kim did not provide evidence about what Plaintiff actually saw, and what information the company did provide Kim now proclaims to have no knowledge of. In light of DoNotPay's failure to present evidence, its motion must be denied.

DoNotPay submitted two supposed sign up screens in support of its motion. But, in responding to discovery, DoNotPay and Kim admitted that those are heavily cropped from DoNotPay's website. (*See* Decl. of Emily Penkowski Perez ("Penkowski Decl.") ¶ 2, Ex. 1-A, Def.'s Resp. to Pl.'s Interrog. No. 3.) And when asked at his deposition, things just got muddier: Kim testified that those screenshots came from a desktop computer, but assiduously answered that he did "not recall" when asked what browser was used or who had even taken the screenshots. (*See* Penkowski Decl. ¶ 3, Ex. 1-B, Dep. Tr. of Andrew Kim ("Kim Tr."), at 20:10–21.) Kim further testified that Plaintiff initially signed up for DoNotPay on a mobile phone (*id*. at 34:12–18), but had no knowledge about whether the terms link would actually have been visible to Plaintiff or any mobile user, (*id.* at 36:16–21) ("[W]hen plaintiff evidently created the account on a phone, are you able to tell if plaintiff actually saw the hyperlink to the terms? [Objection.] A: I'm not sure."). DoNotPay declined to proffer evidence of the mobile version in its opening papers or even discovery (which is already too late). (*See generally* Mot.) The Motion, accordingly, never gets off the ground.

Even if the Court were to accept DoNotPay's representations, the terms are not conspicuous and occur at the very first stage of DoNotPay's unusual sign-up process—right after entering an e-mail, and before the user even knows what DoNotPay's service provides or what it costs. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 464 (2021) *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022). And courts have consistently rejected "terms" links that are deliberately inconspicuous in the context of a sales pitch on the remainder of a busy page, even when the fine print is near a "Sign Up" button. *See id.*, *see also e.g.*, *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019). It is certainly possible to create a binding relationship with online consumers, tracking a well-established body of law. *See, e.g.*, *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018) ("We note at the outset that [defendant] chose not to use a common

1  method of conspicuously informing users of the existence and location of terms and conditions:

2  requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink,

3  before continuing to the next screen"). DoNotPay notably decided not to go that route.

4        DoNotPay's users, particularly, would have no reason to be on the hunt for an arbitration

5  clause. That's because the company has publicly taken a strong and consistent position *against*

6  arbitration, decrying it as a license for companies to "behav[e] badly."[1] Instead, DoNotPay's founder

7  and CEO, Joshua Browder, has spoken in favor of class actions and insisted that a company's terms

8  of service should not function as a "get out of jail free card." (*Id.* at 16:25.) Indeed, DoNotPay's

9  marketing is uniquely focused on rooting out inconspicuous arbitration terms: it developed a

10  software billed as "Do Not Sign" that claims to read terms agreements and highlight "problematic"

11  terms—including, specifically, arbitration. When a company takes such a clear public stance against

12  arbitration, it lulls its consumers into a false sense of security—surely, no company would be so

13  brazen as to call out others for burying "get out of jail free card[s]" and then do exactly that.

14        DoNotPay has failed to provide competent evidence and, even if that evidence were

15  considered, consumers did not assent to the company's terms. The motion should be denied.

16                                      **FACTUAL BACKGROUND**

17  **I.   DoNotPay has failed to provide evidence of what the Sign Up Screens actually looked like.**

18

19        DoNotPay's Motion turns on two "Sign Up Screens": Sign Up Screen I and Sign Up Screen

20  II. (Mot. at 2–3.) According to DoNotPay—all facts here are DoNotPay's, as it is their burden—

21  users encounter either or both screens, due to DoNotPay's unusual, hybrid process for signing up or

22  signing in. (*Id.*) A typical new user would encounter Sign Up Screen I at DoNotPay's homepage, at

23  donotpay.com. (*Id.*) After clicking "Log In/Sign Up" on that page, a user would then enter payment

24  information and subscribe to DoNotPay.

25        An existing user is more likely to go to donotpay.com/login, which would take them to Sign

26  Up Screen II. (*See id.*) Clicking "continue" would either log them in or, if the user input a new e-

27  mail or phone number, create a new account through the same box. (*Id.* at 3.) DoNotPay contends

28

---

[1]    Law Insider, *Robinhood's Customer Service Agreements w/ Joshua Browder*, YOUTUBE (Feb. 3, 2021), https://www.youtube.com/watch?v=psHiyAtoDd8, at 13:44.

that Plaintiff initially signed up through the home page at donotpay.com (Sign Up Screen I) on May 17, 2021, and then "signed up" again when he logged in from the donotpay.com/login page (Sign Up Screen II), on July 2, 2021, and March 28, 2022. (*Id.* at 6.)

It is solely these two Sign Up Screens—and four log-ins/sign-ups through them—on which DoNotPay's motion turns. But what those Sign Up Screens actually looked like is very much a moving target. First, DoNotPay claimed in its Motion that the screens appeared as closely-cropped views around the sign-up boxes. (*Id.* at 2–3.) Plaintiff issued discovery requests, however, and in response DoNotPay produced far larger screens containing the sign-up boxes, which showed that the "terms" text is the smallest text on both Sign Up Screens and appears in the context of an eye-catching sales pitch:




(*Compare* Sign Up Screen I, Dkt. 30-1 ¶ 8 *with* Def.'s Resp. to Pl.'s Interrog. at Ex. A.)




(*Compare* Sign Up Screen II, Dkt. 30-1 ¶ 8; *with* Def.'s Resp. to Pl.'s Interrog. at Ex. B.) Larger versions of each are attached as Appendix A.

DoNotPay's sole declarant in support of the motion is Andrew Kim, and he is also the person who verified the interrogatory responses. Plaintiff deposed Mr. Kim, and that deposition demonstrated significant gaps in DoNotPay's evidentiary foundation and in Kim's own knowledge.

1    Kim's knowledge is different as to Sign Up Screen I and II. In his declaration, Kim asserted

2    that he had personal knowledge of Sign Up Screen I at the relevant time, and had pulled a version of

3    it from the Wayback Machine. (Dkt. 30-1 ¶ 9.) For Sign Up Screen II, though, Kim notably did *not*

4    attest he had personal knowledge of what it looked like during the relevant time, and had not pulled

5    a version from the Wayback Machine. (*See id.* ¶ 10.) Instead, he claimed that he had "personally

6    retrieved the image of Sign Up Screen II from DNP's records, as they are kept in the ordinary course

7    of business." (*Id.*)

8    Just thirty-nine days after executing that declaration, however, Kim claimed not to remember

9    if he had personally taken either of the screenshots, instead responding "I don't recall." (Kim Tr. at

10   27:19–22.) Nor was Kim able to explain his professed lack of personal knowledge in his declaration

11   as to Sign Up Screen II. When asked "how do you know that those were the screens that were in

12   place at those times, if you do know?" he responded "we have the Wayback Machine to verify what

13   we recreated locally." (*Id.* at 18:18–22.) But when asked why he did not verify Sign Up Screen II on

14   the Wayback Machine, he similarly claimed that he somehow "did not recall." (*Id.* at 18:23–19:2.)

15   When it came to Sign Up Screen I, Kim did not have any knowledge about how Sign Up

16   Screen I would *actually* have been presented to Plaintiff at his initial sign-up. Kim testified that

17   DoNotPay's records showed that Plaintiff signed up on a cell phone. (*Id.* at 34:12–18.) But what

18   DoNotPay provided was not the website loaded on a cell phone, but a screenshot from a desktop. (*Id.*

19   at 19:24–20:13.) As to what the screens would look like on a cell phone, Kim responded "I'm not

20   sure" to questions about whether the link to the terms would have been within view when opened on

21   a mobile device, (*id.* at 56:18–23), or whether DoNotPay even had records of what the website

22   looked like on a mobile phone, (*id.* at 59:20–22). DoNotPay has notably presented *no* evidence of

23   what the sign-up flow looks like in a mobile browser.

24   More generally, Kim claimed to have forgotten or lacked knowledge about many basic facts.

25   Kim's declaration stated it attached "[a] true and correct copy of DNP's Terms and Conditions, as

26   they existed at all relevant times." (Dkt. 30-1 ¶ 7.) But that also appears to be wrong: Plaintiff

27   located an additional Terms of Service—pulled from the Wayback Machine—that states it was

28   updated in July 6, 2021 (and thus existed at the time of Plaintiff's last purported sign up in March

2022). (Penkowski Decl. ¶ 5, Ex. 1-D, July 6, 2021 Terms of Service at 7.) But Kim claimed he was not sure if he recognized it and generally asserted he was not familiar with Terms updates. (Kim Tr. at 50:4–21 ("I don't know. I'm not familiar with the terms of service updates.").) When pressed about who would have the answers to the questions that did not fall within Kim's knowledge, he repeatedly claimed not to know who at the company would know—despite the fact that the company is a start-up with less than ten full-time employees. (*Id.* at 11:5–18, 38:5–19, 46:18–22, 64:16–23.)

**II.      DoNotPay has no evidence that Plaintiff viewed the Terms and Conditions.**

DoNotPay's arbitration clause is contained in its Terms and Conditions, which are attached by hyperlink to the Sign Up Screens. Kim testified DoNotPay records users' activity on its website with a tracking script that, typically, tracks "every page viewed by the user." (Kim Tr. at 41:10–12.) Despite that, Kim maintained he does not know if "plaintiff accessed the terms of service page," (*id.* at 74:10–14), and answered "I do not recall" when asked if he had looked, (*id.* at 73:13–20).

**III.      The Terms and Conditions (until very recently) did not display the arbitration clause prominently.**

The operative Terms and Conditions contain the same arbitration clause, in the same place— at page 7. Arbitration is not mentioned or referenced in the Terms before then. DoNotPay overhauled both its Sign Up Screens and the Terms themselves were later updated, after DoNotPay began to anticipate litigation related to its unauthorized practice of law, and now flag its arbitration clause both on the Sign-Up Pages and at the very top of the Terms.



Terms of Service and Privacy Policy, DONOTPAY.COM, https://donotpay.com/learn/terms-of-service-and-privacy-policy/ (last accessed June 23, 2023); Home Page, DONOTPAY.COM, https://donotpay.com (last accessed June 23, 2023).

1

2

**IV.    When asked about the process for opting out, DoNotPay's declarant was unable to confirm that DoNotPay actually received such opt out requests and robotically recited a rehearsed line fourteen times.**

3

4

DoNotPay's arbitration clause, at the relevant time, permitted users to opt out of arbitration

5

by mailing a written notice to its business address at 164 Townsend Street in San Francisco. (Kim

6

Tr. at 45:12-19.) But Kim was not able to confirm that opt out requests were actually accepted at that

7

address. Plaintiff repeatedly asked whether DoNotPay received mail at the address listed for opt

8

outs, or could receive mail there. In response, Kim repeated the same line, over and over again:

9

"during all applicable times in the terms of service there was a procedure in place to accept

10

arbitration opt out requests." (*Id.* at 48:13–16.) Asked any follow-up questions about what that

11

procedure was, or his basis for his supposed knowledge, Kim repeated the same line—a total of

12

fourteen times. (*See, e.g.*, *id.* at 45:7–55:6, 67:17–70:12.)

13

There are many open questions about whether (and when) DoNotPay has maintained an

14

office and accepted mail in San Francisco. DoNotPay's CEO, Browder, claimed at one point that the

15

company would cease all operations in San Francisco as of May 31, 2021 (two weeks after Plaintiff

16

first signed up). (@jbrowder1, TWITTER, (Apr. 24, 2021),

17

https://twitter.com/jbrowder1/status/1386052673833627649.) Browder later filed a declaration

18

asserting the company had exited San Francisco as of late 2021. (Penkowski Decl. ¶ 4, Ex. 1-C,

19

Declaration of Joshua Browder in *Tewson v. DoNotPay, Inc.*, ¶ 3.) Another DoNotPay user, Kathryn

20

Tewson, attempted to opt out by sending a letter to that address in January 2023, when the company

21

still directed opt out requests there. (Declaration of Kathryn Tewson ("Tewson Decl.") ¶ 3.) The

22

letter was returned as undeliverable. (*Id.* ¶¶ 3–4.)

23

## LEGAL STANDARD

24

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, requires district courts to stay judicial

25

proceedings and compel arbitration of claims covered by a written arbitration provision when the

26

arbitration provision is valid and enforceable. *Id.* § 3. The Court must determine whether a valid

27

arbitration agreement exists and whether the agreement encompasses the disputes at issue. *See*

28

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019). The party seeking to compel

arbitration—here, Defendant—bears the burden of proving that a valid agreement to arbitrate exists

1    based on a preponderance of the evidence. *Id.* The court is to draw all inferences in favor of the party

2    opposing arbitration. *Hill v. Quicken Loans Inc.*, No. ED CV 19-0163 FMO (SPx), 2020 WL

3    5358394, at *5 (C.D. Cal. Aug. 5, 2020).

4         "While new commerce on the Internet has exposed courts to many new situations, it has not

5    fundamentally changed the principles of contract," including the requirement of mutual

6    manifestation of assent. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).

7    "In California, 'mutual assent [by word or conduct] is the key to contract formation.'" *Lopez v.*

8    *Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1097 (S.D. Cal. 2018) (citation omitted).[2] In evaluating

9    assent, courts have developed a spectrum of internet contracts, from "clickwrap" agreements—

10   which present a user with terms and conditions and require the user to affirmatively click a button to

11   agree to the terms—to "browsewrap," which relies on the consumer's mere use of the app or website

12   to demonstrate agreement. *Nguyen*, 763 F.3d at 1175–76. DoNotPay's fits into a third category

13   between the two, called "sign-in wrap," where the screen includes a statement that signing up

14   constitutes agreement to a set of Terms, but users are not required to view or assent to the Terms

15   other than by signing up for the service. *See Sellers*, 73 Cal. App. 5th at 464. Absent actual

16   knowledge of the terms, assent turns on "whether the website puts a reasonably prudent user on

17   inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177.

18

19

20

21

22

23

24

25   _____

     [2]      DoNotPay appears to concede that California law applies to this Motion. (Mot. at 8.) It

26   does— Plaintiff, a California resident, brings California state-law claims relating to a transaction that

     took place in California, so California law applies. *See Vrugtman v. It's Just Lunch Int'l LLC*, No.

27   EDCV 20-2352 JGB (SPx), 2021 WL 4979443, at *3 (C.D. Cal. Sept. 24, 2021) (first prong of

     California choice-of-law test as "whether the chosen state has a substantial relationship to the parties

28   or their transaction")*; Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that

     federal courts must apply choice-of-law rules of state in which they sit).

1

**<u>ARGUMENT</u>**

2

**I.      DoNotPay has not provided evidence to support its motion.**

3

On a motion to compel arbitration, courts apply a standard similar to summary judgment,

4

including considering evidence outside the pleadings per Federal Rule of Civil Procedure 56. *Burger*

5

*v. Northrop Grumman Sys. Corp.*, No. 2:21-cv-06761 AB (MRWx), 2021 WL 8322270, at *4 (C.D.

6

Cal. Oct. 27, 2021). To be considered, a declaration must "be made on personal knowledge, set out

7

facts that would be admissible in evidence, and show that the affiant or declarant is competent to

8

testify on the matters stated." Fed. R. Civ. P. 56. DoNotPay submitted the Kim Declaration with its

9

motion to prove (1) what its Sign Up Screens looked like; (2) which Sign Up Screens Plaintiff saw;

10

(3) which Terms and Conditions were in place at the time Plaintiff signed up for DoNotPay; and (4)

11

whether users could opt out of arbitration, and if Plaintiff did. (*See generally* Dkt. 30-1.)

12

Kim's deposition testimony contradicts his assertion that he "personally retrieved" either

13

Sign Up Screen; he claims he has no idea whether it was him or another engineer. (*Id.* ¶¶ 9–10; Kim

14

Tr. at 27:12–22.) Nor was DoNotPay candid about what the Sign Up Screens actually looked like in

15

its motion, and provided the full picture only in discovery. (*Compare* Dkt. 30-1 ¶ 8 *with* Def.'s Resp.

16

to Pl.'s Interrog. at Exs. A, B.) Kim admitted from the get-go that he lacked personal knowledge of

17

what Sign Up Screen II looked like (*compare* Dkt. 30-1 ¶ 9 *with id.* ¶ 10), and implausibly claimed

18

he did not remember why he did not verify what Sign Up Screen II looked like. (Kim Tr. at 18:1–

19

19:2.) DoNotPay made no effort (and can't now) to establish that the records *someone* used to create

20

Sign Up Screen II were admissible business records. (*See* Dkt. 30-1; Fed. R. Evid. 803(6).) In the

21

absence of personal knowledge or any necessary foundation, the Declaration should be stricken. *See*

22

*In re Uber Text Messaging*, No. 18-CV-02931-HSG, 2019 WL 2509337, at *6 (N.D. Cal. June 18,

23

2019) (striking an exhibit where declarant lacked personal knowledge to authenticate it).

24

Nor did DoNotPay provide any evidence about what Sign Up Screen I actually looked like

25

when Plaintiff purportedly encountered it: on a mobile phone. (*See* Kim Tr. at 34:12–18.) DoNotPay

26

presented no evidence that the terms link would actually be visible on the smaller mobile phone

27

screen. (*See id.* 56:18–25; 59:14–22.) Having failed to provide competent evidence, DoNotPay did

28

not meet its burden and the motion should be denied. *See Snow v. Eventbrite, Inc.*, No. 3:20-CV-

03698-WHO, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020) ("[T]he evidence [defendant] offers does not demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period" where it only included examples of similar screens, and not the actual screens the plaintiffs saw).

## II.    DoNotPay cannot enforce a purported contract to which Plaintiff never agreed.

Even if the Court is to consider the screenshots that DoNotPay put forward, DoNotPay has not carried its burden to show that users agree to the inconspicuous terms. DoNotPay's Motion has to show that its two Sign Up Screens "put[] a reasonably prudent user on inquiry notice of the terms of the contract," and gave them reason to click on the terms. *Nguyen*, 763 F.3d at 1177–79. But a reasonable DoNotPay user, in particular, would have no reason to be on the hunt for an arbitration clause given DoNotPay's vocal and consistent public position *against* arbitration. DoNotPay gave no effective notice of its Terms and Conditions, consistent with other Courts who have evaluated similar screenshots, and the company does not contend (nor can it) that Plaintiff ever saw them. The motion should be denied.

### A.    DoNotPay has taken an aggressive public position against arbitration, and its users would have no reason to expect that DoNotPay itself had a difficult-to-find arbitration clause.

DoNotPay has publicly criticized arbitration agreements, particularly those with class action waivers, in its ubiquitous marketing. The company's CEO, Joshua Browder, argued that when companies force consumers to arbitrate, people "lose a lot of rights," including a meaningful right to discovery. (Law Insider, *supra*, at 13:22.) Arbitration, he insisted, "means that companies can behave badly[.]" (*Id.* at 13:44.) And class action waivers, particularly, are "very dangerous for consumers" because the number one thing a company is scared of is a class action." (*Id.* at 15:00.)

DoNotPay was so focused on anti-arbitration marketing that it created a product in 2019, called "Do Not Sign," that would flag arbitration clauses in terms of service agreements.[3] One driving reason for Do Not Sign, in Browder's words, was that "A lot of these companies are slipping these things in because they know no one actually knows . . . I think there will be a race to remove

---

[3]    *See* Paul Sawers, *DoNotPay's Legal Bots Help Consumers Fight the System During Lockdown*, VENTUREBEAT (June 23, 2020), https://venturebeat.com/ai/donotpays-legal-bots-help-consumers-fight-the-system-during-lockdown.

1    all of these exploitative things, if people just knew about them."[4] Users would have no reason to

2    expect that the very terms that the company was criticizing as exploitative would be tacked on to

3    DoNotPay's own service. (And DoNotPay's users have no opportunity to turn the Do Not Sign

4    service onto DoNotPay's terms, as users purportedly agree to the terms from the minute they put in

5    an e-mail address—before they have access to anything.)

6           When asked about DoNotPay's own use of arbitration, Browder proclaimed that DoNotPay's

7    arbitration clause is "optional," and touted that another party that sued the company had "the

8    opportunity to challenge us in the courts, not arbitration."



13   (@jbrowder1, TWITTER, (June 3, 2022),

14   https://twitter.com/jbrowder1/status/1532895192596025344.) The company's choice to publicly

15   double down on its anti-arbitration stance again gives users all the less reason to ferret out a link to

16   the terms. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).

17          Finally, if what Browder meant by "optional" was that there was an opt-out provision, this

18   too was window dressing. The opt out provision, until February 2023, directed users to send a letter

19   to the company's Townsend Street in San Francisco. (*See* July 6, 2021 Terms at 7.) At least one user

20   who attempted to do during that period had their opt out request returned as undeliverable. (*See*

21   Tewson Decl. ¶¶ 3–4.) And the company claimed to be leaving San Francisco as of May 31, 2021.

22   Kim, for his part, demonstrated absolutely no knowledge about whether it was actually possible to

23   opt out of arbitration, and instead rotely repeated a line that there was a "process" in place for

24   accepting those requests—of which he evidently had no personal knowledge. (Kim Tr. at 46:9–22;

25   68:10–69:24.) The point, for DoNotPay, was not that users could *actually* opt out of arbitration, but

26   to provide illusory "options" consistent with its public stance.

27

28   _____
     [4]      Jon Porter, *This 'robot lawyer' can take the mystery out of license agreements*, THE VERGE
     (Nov. 20, 2019), https://www.theverge.com/2019/11/20/20973830/robot-lawyer-donotpay-ai-
     startup-license-agreements-sign-arbitration-clauses.

It is absolutely possible to provide users with conspicuous notice of terms to which they actually agree: the gold standard is clickwrap, prominently displayed, that requires a positive affirmation that a user is agreeing. *See, e.g.*, *Berman*, 30 F.4th at 836 (clickwrap agreements are "[t]he most straightforward application of [contract] principles in the online world"). But DoNotPay chose not to do that, and its own anti-arbitration marketing shows that choice was intentional. And having lulled its users into thinking that DoNotPay would not "slip[] in" an arbitration term, DoNotPay users had no reason to be looking for one. As discussed below, DoNotPay's links to terms were not conspicuous—consistent with what other Courts have held—but were particularly so for DoNotPay's own users who had been deliberately told they needn't look for one.

## B.   DoNotPay's Sign Up Screens do not give users reasonably conspicuous notice of its Terms.

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," *Nguyen*, 763 F.3d at 1179. To do so, (a) a notice must be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it"; and (b) "the design of the hyperlinks must put such a user on notice of their existence." *Berman*, 30 F.4th at 856-57. It is easy for website designers to create enforceable terms, including by using true clickwrap, large font sizes, blue hyperlink text, and explicit warning text. *Id.* DoNotPay's screens fail to do so.

First, DoNotPay's Sign Up Screens hide the warning text with small font, and obscure it with larger, more prominent text and graphics. (*See* Appendix A for large-size images.) Sign Up Screen I uses a small and nearly translucent font that blends into the bright gradient background. The page, which is the home page of DoNotPay's website, distracts the eye with a large graphic of a phone off to the side and a large tagline for "The World's First Robot Lawyer." Sign Up Screen II fares little better: while lacking the garish background, its warning text is similarly small, much smaller and mostly lighter in color than what surrounds it. The relevant notice is again subsumed by darker promotional text: a quote, "'**The Hero the World Needs**' – TIME Magazine, June 2016," (emphasis in original) above logos for six media companies.

1        Similar to in *Berman*, "other visual elements draw the user's attention away from the barely

2    readable critical text." 30 F.4th at 857; *see also* Appendix B (screenshots from *Berman*).

3    DoNotPay's Motion cites to only the mobile screen in *Berman*, ignoring the analogous desktop

4    screen that, similarly, uses graphics and larger text that distracts from small, gray warning text.

5    Similarly, in *Sellers*, 73 Cal. App. 5th at 480, the California appellate court considered a desktop

6    page with similar large background graphics, holding that the link to the Terms are "relatively

7    inconspicuous" because of the "extremely small" print, its location "outside the white box containing

8    the payment fields where the consumer's attention would necessarily be focused," where though the

9    background is dark the "contrast is not sufficient to make the text apparent." *Id.* at 481; *see also*

10    *Berman*, 30 F.4th at 857 (citing with approval *Sellers*' analysis of inconspicuous hyperlinks).

11        Just like in *Sellers*, DoNotPay's links similarly "appear[] in smaller print than any other print

12    on the page and in a grey shade that contrasts with the dark background significantly less than the

13    other text on the page." *Sellers*, 73 Cal. App. 5th at 481; *see also Cullinane*, 893 F.3d at 58. While

14    Sign Up Screen II uses a stark pink-and-black color scheme, the larger and busier design elements

15    overshadow the text and accompanying hyperlinks, rendering them inconspicuous. *See id.* Sign Up

16    Screen II is similar to *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017), which

17    found no agreement to terms in a "clickwrap" agreement where the warning text "is in the smallest

18    font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the

19    bold header 'Add Phone Number' at the top." *Id.*; *see* Appendix B (for screenshots from *Sellers,*

20    *Applebaum,* and *Cullinane*).

21        Most of the cases DoNotPay cites can be distinguished because they relied upon the lack of

22    "clutter" and "additional text," where the warning including a hyperlink was surrounded by "ample

23    white spacing" and "text no larger than the notice itself." *See Snow v. Nectar Brand, LLC*, No. 2:22-

24    cv-07912-MCS-MRW, 2023 WL 2558544, at *2–3 (C.D. Cal. Mar. 2, 2023); *Pizarro v. QuinStreet,*

25    *Inc.*, No. 22-CV-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022). *Pizarro* also

26    found the webpage's "muted, and essentially uniform, color scheme" significant. 2022 WL 3357838,

27    at *3. DoNotPay's pages are nothing like that. Its bright color scheme and large background or

28    surrounding graphics easily distract users from a diminutive bit of text and hyperlink.

1    Finally, neither Sign Up Screen would make a reasonable user think a hyperlink exists in the

2    warning text. Neither use the classic blue to indicate a hyperlink. *In re Ring LLC Priv. Litig.*, No. CV

3    19-10899-MWF (RAOx), 2021 WL 2621197, at *9 (C.D. Cal. June 24, 2021), *appeal dismissed*, No.

4    21-55872, 2022 WL 3339845 (9th Cir. Aug. 3, 2022) (where a screen did not use blue hyperlinks,

5    the court found it was "a much closer call" than others that did); *see also Peter v. DoorDash, Inc.*,

6    445 F. Supp. 3d 580, 587 (N.D. Cal. 2020) ("The hyperlinks are both in blue, indicating to users that

7    they are clickable."). In Sign Up Screen I, the text of the hyperlink is the same near-translucent grey

8    of the rest of the warning text, and in the same size. While it is underlined, "[s]imply underscoring

9    words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably

10   prudent user that a clickable link exists." *Berman*, 30 F.4th at 857. Sign Up Screen II uses a different

11   tactic: the hyperlink is pink, rather than the muted grey of the rest of the warning text. While, in

12   general, bright pink hyperlinks (or any contrasting color) may be acceptable, other features of the

13   screen present here may render a pink hyperlink "not reasonably conspicuous." *See Hooper v. Jerry*

14   *Ins. Agency, LLC*, No. 22-CV-04232-JST, 2023 WL 3992130, at *4 (N.D. Cal. June 1, 2023)

15   (allowing a bright pink hyperlink, where warning text "contrasts clearly" with a "white background"

16   on an uncluttered webpage). Those features are not present in Sign Up Screen II, and the bright pink

17   used for the hyperlinks is the same accent color used throughout the rest of the page. This follows

18   the same logic as *Colgate*, 402 F. Supp. 3d at 765—in *Colgate*, the page rendered one hyperlink

19   differently from the other, therefore users could not be expected to realize the second was in fact a

20   hyperlink. *Id.*; *see also* Appendix B (screenshots from *Colgate*). Here, the hyperlink is disguised by

21   the other bright pink text on the page that is *not* a hyperlink. "Consumers cannot be required to hover

22   their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to

23   'ferret out hyperlinks.'" *Berman*, 30 F.4th at 857 (quoting *Nguyen*, 763 F.3d at 1179).

24   DoNotPay contrasts its Sign Up Screens to those of *Wilson*, 944 F.3d at 1217 and *Berman*,

25   30 F.4th at 861, arguing that in *Wilson* the court observed that "a user *actively* seeking to find the

26   notice of terms and conditions on the screens from *Berman* and [*Wilson*] would struggle to do so."

27   (Mot. at 13.) No court has required users to try that hard. *Nguyen*, 763 F.3d at 1179 (a user need not

28   "ferret out" terms to which they have no reason to suspect they will be bound). The question is

whether a "reasonable user scanning the page" is likely to see the "Terms and Conditions hyperlink and "conclude that they were clickable." *Colgate*, 402 F. Supp. 3d at 765  (the "later sign up" page has blue hyperlinks on a minimal page, but the difference between these hyperlinks and one further up is too confusing to manifest assent). DoNotPay's screen does not provide that notice.

### C.    DoNotPay's Sign Up Flow does not show manifest assent to its Terms.

DoNotPay construes clicking its "Sign Up/Log In" and "Continue" buttons as a manifestation of users' assent to be bound by its Terms, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. *Berman*, 30 F.4th at 857.

Both Sign Up Screens state that "By signing up or signing in, you are agreeing to DoNotPay's Terms and Conditions," but they are also both the very first step of signing up for an account: on these pages, a user simply enters their email address or phone number. A reasonable user would not understand simply entering their email address or phone number as the act of "signing up" for a service, before they create a password, fill out a profile, or purchase a subscription.[5] *See Sellers*, 73 Cal. App. 5th at 480  (plaintiffs believed they were signing up for a $5 trial of a service, which "is not a situation in which '[t]he registration process clearly contemplated some sort of continuing relationship ... that would require some terms and conditions'" (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80 (2d Cir. 2017)). The Sign Up Screens are "not 'in visual proximity . . .  to the request for consent to the offer,'" and therefore it is not where a "'reasonably prudent user' would expect to enter into a contract." *Id.* at 482 (quoting Cal. Bus. & Prof. Code § 17602). Sign Up Screen I is particularly egregious because it is DoNotPay's home page—the first thing a user sees upon entering the site. Sign Up Screen II, then, is particularly confusing because the button users press says only "Continue"—not indicating that an account is being created. Similar to *Berman*, the warning text does not "explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement," where that action is pressing a button that says "Continue." 30 F.4th at 858.

---

[5]    Each of the cases DoNotPay cites in support of its Motion rely on notice given at the final step of placing an order or making an account. DoNotPay's do not. As discussed above, a user is not looking for the Terms at the initial phase of account creation. (*See supra* § II.B.)

1    Finally, as discussed above, DoNotPay has provided *no* evidence of what Plaintiff would

2    have seen when he first signed up for the service and failed to carry their burden. But neither

3    Plaintiff nor any consumer would be on the lookout for Terms when simply attempting to sign in to

4    the service again, which in DoNotPay's unusual compound log-in/sign-up process are one and the

5    same. Thus, Plaintiff's subsequent uses of the DoNotPay platform to create new accounts could not

6    put Plaintiff on inquiry notice.[6] If the Court does consider those uses, though, DoNotPay still did not

7    provide conspicuous notice of the terms through Sign Up Screen II. (*See supra* § II.B.)

8                                **CONCLUSION**

9    Plaintiff respectfully requests that the Court deny DoNotPay's Motion to Compel Arbitration.

10

11                          Respectfully submitted,

12                          **EDELSON PC**,

13   Dated: June 23, 2023       By: /s/ J. Eli Wade-Scott
                                One of Plaintiff's Attorneys
14

15                          Rafey S. Balabanian (SBN 315962)
                            rbalabanian@edelson.com
16                          EDELSON PC
                            150 California Street, 18th Floor
17                          San Francisco, California 94111
                            Tel: 415.212.9300
18                          Fax: 415.373.9435

19
                            Jay Edelson (*pro hac vice*)
20                          jedelson@edelson.com
                            J. Eli Wade-Scott (*pro hac vice*)
21                          ewadescott@edelson.com
                            Emily Penkowski Perez (*pro hac vice*)
22                          epenkowski@edelson.com
                            EDELSON PC
23                          350 North LaSalle Street, 14th Floor
                            Chicago, Illinois 60654
24                          Tel: 312.589.6370
                            Fax: 312.589.6378
25
                            *Attorneys for Plaintiff and the Proposed Class*
26

27   _____
     [6]    DoNotPay expressly disclaimed reliance on Plaintiff's use of the platform beyond these four
28   log-ins. (*See* Def. Resp. to Pl.'s Interrog. No. 3.) Though DoNotPay references Plaintiff's use of the
     platform, the company refused to provide evidence of that in discovery and is not relying on
     Plaintiff's use. (*See id.* at No. 4.)