# EXHIBIT 1-B

Deposition Transcript

Case Number: 3:23-cv-01692-JD
Date: June 5, 2023

In the matter of:

# FARIDIAN v DONOTPAY, INC.

## Andrew Kim



**CERTIFIED COPY**

Reported by:

Grace Baldino
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

- - -

1      IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF CALIFORNIA
2            SAN FRANCISCO DIVISION

3                    - - -

4   JONATHAN FARIDIAN,            :
    individually and on           :
5   behalf of all others          :
    similarly situated,           :
6            Plaintiff,           :
                                  :  NO. 3:23-CV-01692-JD
7            vs.                   :
                                  :
8   DONOTPAY, INC., a             :
    Delaware corporation,         :
9            Defendant.           :

10                   - - -

11            Monday, June 5, 2023

12                   - - -

13

14         Videotaped deposition of ANDREW KIM, taken

15   pursuant to Notice and remotely via Zoom, commencing

16   at 10:03 a.m., and reported stenographically by

17   Grace M. Baldino, Professional Shorthand Reporter

18   and Notary Public in and for the Commonwealth of

19   Pennsylvania.

20                   - - -

21

22

23

24

25

- - -

1    APPEARANCES:

2

         EDELSON PC
3        BY:   ELI WADE-SCOTT, ESQUIRE
               EMILY PENKOWSKI, ESQUIRE
4        350 North LaSalle Street
         14th Floor
5        Chicago, IL 60654
         312-589-6370
6        ewadescott@edelson.com
         epenkowski@edelson.com
7        Representing the Plaintiff

8

9        WILSON SONSINI GOODRICH & ROSATI
         BY:   ELI B. RICHLIN, ESQUIRE
10             PAUL C. GROSS, ESQUIRE
               ALLIE FELLOWS, ESQUIRE
11       1301 Avenue of the Americas
         40th Floor
12       New York, NY 10019
         212-999-5800
13       erichlin@wsgr.com
         pgross@wsgr.com
14       afellows@wsgr.com
         Representing the Defendant

15

16

17

18                    - - -

19

     ALSO PRESENT:
20

         ISH RESTO, Video Technician
21

22                    - - -

23

24

25

```
                          - - -
 1                        INDEX

 2                        - - -

 3    Testimony of:  ANDREW KIM

 4

 5                                                  PAGE

 6    By Mr. Wade-Scott    . . . . . . . . . . .    7

 7    By Mr. Gross         . . . . . . . . . . .    77

 8

 9

10                        - - -

11                      EXHIBITS

12                        - - -

13    NUMBER    DESCRIPTION                         PAGE

14    1         Declaration of Andrew Kim           13

15    2         Answers to Interrogatories          14

16    4         Terms of Service                    51

17    3         Mobile Screenshot                   58

18

19

20

21

22

23

24

25
```

```
                         -  -  -
1                DEPOSITION  SUPPORT  INDEX

2                         -  -  -

3

4   INSTRUCTION NOT TO ANSWER:

5   Page        Line

6      (None)

7

8

9   REQUEST FOR PRODUCTION OF DOCUMENTS:

10  Page        Line                Description

11     (None)

12

13

14  STIPULATIONS:

15  Page        Line

16   5            1

17

18

19  QUESTIONS MARKED:

20  Page        Line

21     (None)

22

23

24

25
```

- - -

1          (It is hereby stipulated and agreed by and

2    among counsel for the respective parties that

3    sealing, certification and filing are waived;

4    and that all objections, except as to the form

5    of the question, be reserved until the time of

6    trial.)

7                    - - -

8          THE TECHNICIAN:  Good morning.  We are on

9    the record at 10:03 a.m. Central Time on

10   June 5th, 2023 to begin the deposition of

11   Andrew Kim in the matter of Faridian versus

12   DoNotPay, Inc.  This case is venued in the

13   United States District Court for the Northern

14   District of California.  The case number is

15   23-CV-01692-JD.  This deposition is taking

16   place via Zoom video conference.  The legal

17   videographer is me, Ish Resto, here on behalf

18   of Steno, and our court reporter is Grace

19   Baldino, also here on behalf of Steno.  Would

20   counsel please identify yourselves and state

21   whom you represent.

22         MR. WADE-SCOTT:  Do we need to identify

23   all counsel or just the people that are gonna

24   speak?

25         THE TECHNICIAN:  Anyone that's gonna

\- \- \-

1  speak, I recommend...

2       MR. WADE-SCOTT:  Okay.  I'm Eli Wade-Scott

3  from Edelson, PC, counsel for the plaintiff.

4  Other appearances today will be submitted in

5  the writing.

6       THE TECHNICIAN:  Perfect.

7       MR. GROSS:  I'm Paul Gross from the Wilson

8  Sonsini law firm, counsel for defendant,

9  DoNotPay, and the witness.  I'm joined by my

10  colleagues, Eli Richlin and Allie Fellows.

11       THE TECHNICIAN:  Perfect.  Thank you,

12  Counsel.  Would the reporter please swear in

13  the witness.

14       THE COURT REPORTER:  The attorneys

15  appearing in this deposition acknowledge that I

16  am not physically present in the deposition

17  room, that I will be reporting on this

18  deposition remotely, and that I will administer

19  the oath to the witness remotely.

20       The parties and their counsel further

21  agree that the witness may be in a state where

22  I am not a notary and stipulate, pursuant to

23  Federal Rule of Civil Procedure 29, that this

24  deposition may be taken before me.

25       If any party does have an objection to

```
                           - - -
 1       this manner of reporting or anything stated
 2       above, please state so now.  Hearing none, we
 3       can proceed.
 4                         - - -
 5           ANDREW KIM, after having been first
 6       remotely duly sworn, was examined and testified
 7       as follows:
 8                         - - -
 9                      EXAMINATION
10                         - - -
11   BY MR. WADE-SCOTT:
12       Q.   Mr. Kim, I'm Eli Wade-Scott.  I'm gonna be
13   asking you some questions today.  Just to run
14   through some formalities quickly -- we're trying to
15   get you out of here as quickly as possible, but
16   these are kind of standard things to go through.
17   This is a less formal proceeding than a courtroom,
18   but it carries with it some of the same formalities.
19   You understand that you're under oath today?
20       A.   Yes.
21       Q.   That's the same oath you would take if you
22   were to testify in court; do you understand that?
23       A.   Yes.
24       Q.   I'm gonna ask you a series of questions
25   today.  If you don't understand any of those
```

- - -

1  questions, just let me know.  If you answer a

2  question without asking me to clarify, I'll assume

3  that you understood it; is that fair?

4      A.   Yes.

5      Q.   We're being recorded stenographically

6  today, meaning that the court reporter is taking

7  down what we say, in addition to being recorded.

8  You're doing a good job so far giving audible

9  answers to my questions, yeses or nos.  I'll try to

10 cue you, but avoid head shakes or "uh-huhs," which

11 don't record that well, okay?

12     A.   Yes.

13     Q.   If your attorney objects, go ahead and

14 wait for the objection to finish, but, generally

15 speaking, I'm gonna ask you to answer the question

16 at the conclusion of the objection unless you're

17 otherwise instructed, okay?

18     A.   Okay.

19     Q.   And are you in any way impaired or unable

20 to answer my questions today?

21     A.   No.

22     Q.   Have you taken any medication, drugs, or

23 early morning cocktails that would impair your

24 ability to answer my questions?

25     A.   No.

- - -

1      Q.   And will you confirm that you're not

2   receiving communications from anyone else,

3   electronically or in any other manner, while this

4   deposition is proceeding?

5      A.   I can confirm.

6      Q.   All right.  How did you prepare for

7   today's deposition?

8      A.   I met with counsel.

9      Q.   Counsel from Wilson Sonsini?

10     A.   Yes.

11     Q.   Did you meet with anyone else?

12     A.   Are you referring to [indiscernible]

13  within counsel?

14     Q.   Did you meet with anyone other than your

15  attorneys to prepare for the deposition today?

16     A.   I don't believe so.

17     Q.   Did you speak to anyone else at the

18  company -- not attorneys -- about the deposition?

19     A.   I don't believe so.

20     Q.   Did you speak to Joshua Browder about this

21  deposition?

22     A.   I don't believe so.

23     Q.   Did you look at any documents to prepare

24  for the deposition today?

25     A.   I may have.

- - -

1       Q.   Which documents did you look at?

2       A.   The documents mentioned in my affidavit.

3       Q.   Did you look at any other documents beyond

4   those mentioned in your affidavit?

5       A.   I don't believe so.

6       Q.   So you work at DoNotPay, right?

7       A.   Yes.

8       Q.   What's your title at DoNotPay?

9       A.   My title is vice president of product.

10      Q.   How long have you had that title at the

11  company?

12      A.   For approximately two years.

13      Q.   And just give me the twenty-second version

14  of what your job responsibilities are.

15      A.   Sure.  My job responsibilities are to

16  oversee the product development life cycle, to work

17  on UI/UX initiatives, to work on user tracking

18  initiatives, to work with the engineers on new

19  architectural paradigms, and to work on coming up

20  with new products.

21      Q.   When you say "UX design," does that

22  include like how the website login works?

23           MR. GROSS:  Object to the form.  You can

24      answer.

25           THE WITNESS:  Yes.

- - -

1  BY MR. WADE-SCOTT:

2      Q.   Did you have any input into the creation

3  of DoNotPay's terms of service?

4      A.   I don't believe so.

5      Q.   Do you know who created the terms of

6  service for DoNotPay?

7      A.   I'm not sure.

8      Q.   When the terms have been updated over

9  time, do you know who has made updates to the terms

10  of service for DoNotPay?

11      A.   I don't recall.

12      Q.   Do you know who would know the answer to

13  that question?

14      A.   I'm not sure.

15      Q.   Okay.  You don't know who at the company

16  would generally know who edited the terms of

17  service?

18      A.   I'm not sure.

19      Q.   How many people work at DoNotPay?

20      A.   A lot.  I don't know the exact number.

21      Q.   When you say "a lot," do you mean more

22  than ten?

23      A.   Yeah.  We have definitely more than ten

24  people that work at DoNotPay.

25      Q.   Do you have more than ten full-time,

- - -

1    non-contractor employees?

2        A.    No.

3        Q.    Is it likely that one of the full-time,

4    non-contractor employees is in charge of the terms

5    of service?

6            MR. GROSS:  Object --

7            THE WITNESS:  I'm not sure.

8            MR. GROSS:  Sorry.  Go ahead.

9    BY MR. WADE-SCOTT:

10       Q.    Okay.  So, sitting here today, you do not

11   know who would have edited or created the terms of

12   service at DoNotPay?

13           MR. GROSS:  Object to the form.  Go ahead.

14           THE WITNESS:  I'm not sure.

15   BY MR. WADE-SCOTT:

16       Q.    You're not sure whether you know, or you

17   don't know?

18           MR. GROSS:  Object to the form.

19           THE WITNESS:  I don't recall.

20   BY MR. WADE-SCOTT:

21       Q.    So let's look at what will be marked as

22   Exhibit 1.  I'm gonna drop it in the chat.  Let me

23   know when you have that open.

24       A.    Okay.  I just opened it.

25       Q.    Do you recognize this document?

                                    - - -

1        A.    Can I have a second to read through it?

2        Q.    Yes.

3        A.    Thank you.  Yes, I recognize this

4    document.

5        Q.    What is Exhibit 1?

6        A.    Which page are you referring to?

7        Q.    I'm just saying, generally, what is

8    Exhibit 1?

9        A.    Exhibit 1?  I don't --

10       Q.    To clarify, when I give you documents,

11   they're gonna be labeled as various exhibits.  We'll

12   start at one and go from there.  So I was saying

13   this document is Exhibit 1, so what is this document

14   that I just dropped into the chat?

15            MR. GROSS:  Sorry, Andrew.  Just one

16        thing:  Are these gonna be replaced with marked

17        copies, just because right now this has no

18        marking on it.

19            MR. WADE-SCOTT:  Yeah.  They'll be stamped

20        after -- as part of the transcript that you

21        receive.  They'll be stamped.

22            MR. GROSS:  Okay.  Yeah, all right.  So,

23        Andrew -- and I'm sure the counsel won't object

24        to my statements -- you can understand that

25        your declaration is Exhibit 1?

```
                       - - -
1           THE WITNESS:  Yes.
2           MR. WADE-SCOTT:  I don't object to that.
3      Thanks, Paul.
4  BY MR. WADE-SCOTT:
5      Q.   Okay.  And let's get exhibit -- what will
6  be Exhibit 2 in front of you.  Go ahead and open
7  that up.  Let me know when you have it open.
8      A.   I have it open.
9      Q.   What is the document that I just dropped
10 in the chat, when you've had a chance to take a look
11 at it?
12     A.   So this document is a response to the
13 interrogatories.
14     Q.   Have you reviewed the response to
15 interrogatories before?
16     A.   Yes.
17     Q.   Did you verify that these interrogatories
18 were true and correct?
19          MR. GROSS:  Object to the form.
20 BY MR. WADE-SCOTT:
21     Q.   Go ahead, Mr. Kim.
22     A.   I -- can you repeat the question?
23     Q.   Sure, and I'll change the way I worded it:
24 Did you verify that the responses provided to these
25 interrogatories were true and correct?
```

- - -

1      A.   Yes, I did.

2      Q.   All right. Scroll down in the

3 interrogatory document until you see Exhibit A.

4      A.   Okay, I see it.

5      Q.   So the interrogatory responses say that

6 Exhibit A is one of two possible sign-up screens

7 that a user would have encountered when signing up

8 for DoNotPay during the time period at issue here;

9 is that fair?

10        MR. GROSS: Object to the form.

11        THE WITNESS: Could you repeat the

12     question?

13 BY MR. WADE-SCOTT:

14      Q.   Sure. What is Exhibit A?

15      A.   Exhibit A is one of the sign-up screens,

16 specifically the home page.

17      Q.   The home page of DoNotPay.com?

18      A.   That's correct.

19      Q.   And when would the sign-up screen have

20 looked like this on DoNotPay.com?

21      A.   I'm not sure of the exact dates as I'm

22 aware the home page has changed throughout the

23 course of the past few years, but this is what the

24 home page looked like at all relevant times when

25 Faridian signed up.

- - -

1    Q.   Okay.  Is this screenshot in Exhibit A

2    something that you retrieved from the Wayback

3    Machine at the Internet Archive?

4    A.   I believe, if I remember correctly, I

5    retrieved it from two sources, the Wayback Machine,

6    and also recreating it from a previous version in

7    our code base.

8    Q.   Okay.  Let me circle back to that.  Will

9    you scroll down to Exhibit B in the interrogatory

10   responses?

11   A.   Okay.  I'm there.

12   Q.   How did you retrieve this screen?

13   A.   I believe I recreated it from a version of

14   the code base that was relevant at the time.

15   Q.   Okay.  Why didn't you get this one from

16   the Internet Archive also?

17        MR. GROSS:  Object to the form.

18   BY MR. WADE-SCOTT:

19   Q.   Go ahead.

20   A.   I don't remember.

21   Q.   Do you think that this screen exists

22   somewhere on the Internet Archive?

23        MR. GROSS:  Object to the form.

24        THE WITNESS:  I wouldn't know.

25   BY MR. WADE-SCOTT:

                          - - -

1          Q.   So it's fairly notable in the

2    interrogatory responses that Exhibit B came from

3    DoNotPay's records, and then Exhibit A came from the

4    Internet Archive.  Do you remember that distinction

5    being at issue when you responded to the

6    interrogatories?

7               MR. GROSS:  Object to the form.

8               THE WITNESS:  I don't recall it being an

9          issue.

10   BY MR. WADE-SCOTT:

11         Q.   When you say you recreated these screens

12   from the code base, what do you mean?

13         A.   We -- well, specifically, me and another

14   engineer went back to the version in the code base

15   that was relevant at the time Faridian signed up and

16   redeployed that version of the code base locally and

17   took a screenshot of it.

18         Q.   Who is the other engineer you were working

19   with on this?

20         A.   The other engineer was Tai Nguyen.

21         Q.   Can you spell Mr. Nguyen's name?

22         A.   Yes.  It's -- do you want the full legal

23   name?

24         Q.   However you just said it on the record.

25         A.   T-A-I, space, N-G-U-Y-E-N.

\- - -

1      Q.   And how do you know that Exhibit A and

2 Exhibit B are accurate representations of the login

3 screens at the time?

4         MR. GROSS:   Object to the form.

5         THE WITNESS:   Could you rephrase the

6      question?

7 BY MR. WADE-SCOTT:

8      Q.   So you said that Exhibit A and Exhibit B

9 were the login screens that a user would have seen

10 when logging in when plaintiff created his accounts;

11 is that fair?

12      A.   Yes.

13      Q.   How do you know that they're accurate

14 representations of what a user would have seen at

15 that time?

16      A.   Because those were the screens that were

17 relevant at the time Faridian signed up.

18      Q.   But how do you know that those were the

19 screens that were in place at those times, if you do

20 know?

21      A.   Well, we have the Wayback Machine to

22 verify what we recreated locally.

23      Q.   But, Exhibit B, you did not pull a version

24 from the Wayback Machine, right?

25         MR. GROSS:   Object to the form.

                                _ _ _

1            THE WITNESS:  I don't recall if I pulled

2        one from the Wayback Machine.

3    BY MR. WADE-SCOTT:

4        Q.   Where would Exhibit B have been displayed?

5            MR. GROSS:  Object to the form.

6            THE WITNESS:  Where would it have been

7        displayed?  Sorry.  I don't understand the

8        question.

9    BY MR. WADE-SCOTT:

10        Q.   Sure.  So you said Exhibit A appeared on

11   DoNotPay.com's home screen.  Where would Exhibit B

12   have appeared?

13        A.   One of the places that Exhibit B would

14   have appeared is DoNotPay.com/login.

15        Q.   Is there anywhere else that Exhibit B

16   would have appeared?

17        A.   There could be, but, to my knowledge, I

18   don't remember.

19        Q.   Okay.  So let's look at Exhibit A for a

20   minute.  This is a screenshot of the home page as it

21   would have appeared at the time plaintiff was

22   creating accounts?

23        A.   Yes.

24        Q.   Okay.  What device is this a screenshot

25   from?

                         - - -

1          MR. GROSS:  Object to the form.

2          THE WITNESS:  It appears to me that it's

3     a -- some form of web browser.

4  BY MR. WADE-SCOTT:

5     Q.   Do you know what kind of device this

6  screenshot was taken on?

7          MR. GROSS:  Object to the form.

8          THE WITNESS:  I don't recall.

9  BY MR. WADE-SCOTT:

10     Q.   And when you say "a web browser," do you

11  mean a web browser on a desktop or a web browser on

12  a phone?

13     A.   A desktop.

14     Q.   Do you know what browser this screenshot

15  was taken from?

16          MR. GROSS:  Object to the form.

17          THE WITNESS:  I don't recall.

18  BY MR. WADE-SCOTT:

19     Q.   Did you create this screenshot?

20          MR. GROSS:  Object to the form.

21          THE WITNESS:  I don't recall.

22  BY MR. WADE-SCOTT:

23     Q.   Was there anything else on the DoNotPay

24  home page at the time Exhibit A was being displayed?

25          MR. GROSS:  Object to the form.

- - -

1     THE WITNESS:  I don't think so.

2  BY MR. WADE-SCOTT:

3     Q.   Could you scroll down?  If you were just

4  looking at Exhibit A, was there more content

5  underneath it?

6          MR. GROSS:  Object to the form.

7          THE WITNESS:  Yes.  If you were on

8      DoNotPay.com, you could scroll down.

9  BY MR. WADE-SCOTT:

10     Q.   What was underneath what's displayed in

11  the screenshot?

12          MR. GROSS:  Object to the form.

13          THE WITNESS:  I believe it was article

14      content, like blog post content.

15  BY MR. WADE-SCOTT:

16     Q.   Where it says "The World's First Robot

17  Lawyer," do you know what font size that is?

18          MR. GROSS:  Object to the form.

19          THE WITNESS:  I don't know.

20  BY MR. WADE-SCOTT:

21     Q.   And then the site screenshot in Exhibit A

22  says, "The DoNotPay app is the home of the world's

23  first robot lawyer."  Do you see that?

24     A.   Yes.

25     Q.   Do you know what font size that is?

                              - - -

1              MR. GROSS:  Object to the form.

2              THE WITNESS:  I don't remember.

3    BY MR. WADE-SCOTT:

4         Q.   And then you see, "By signing up or

5    signing in, you're agreeing to DoNotPay's Terms and

6    Conditions and for us to send messages to the phone

7    number or email provided"; do you see that?

8         A.   I see that.

9         Q.   Do you know what font size that is?

10             MR. GROSS:  Object to the form.

11             THE WITNESS:  I don't remember.

12   BY MR. WADE-SCOTT:

13        Q.   Safe to say that it is smaller than the

14   font that is displayed in every other part of this

15   page except for the headers at the top?

16             MR. GROSS:  Object to the form.

17             THE WITNESS:  I'm not sure.  I don't

18        believe so.

19   BY MR. WADE-SCOTT:

20        Q.   You think that it is not smaller than the

21   other text on this page?

22             MR. GROSS:  Object to the form.

23             THE WITNESS:  I -- I wouldn't know.  I

24        would have to check.

25   BY MR. WADE-SCOTT:

- - -

1       Q.   So ignore the headers at the top for a

2   minute.  Is the text "By signing up or signing in"

3   bigger than any other text on the page?

4            MR. GROSS:  Object to the form.

5            THE WITNESS:  I'm not sure what the font

6       is in the images to the right, but just based

7       on that, I'm not confident in an answer to that

8       question.  So, for that reason, I don't know.

9   BY MR. WADE-SCOTT:

10      Q.   What happens after a user clicks "sign up"

11  or "login"?

12           MR. GROSS:  Object to the form.

13           THE WITNESS:  After a user clicks "sign

14      up" or "login," a account gets created.

15  BY MR. WADE-SCOTT:

16      Q.   During any other part of the account

17  creation process, are the terms and conditions

18  displayed to a user?

19           MR. GROSS:  Object to the form.

20           THE WITNESS:  They may be, but I'm

21      definitely aware that they are displayed here.

22  BY MR. WADE-SCOTT:

23      Q.   Well, a link is displayed here, right?

24      A.   Yes.

25      Q.   Is there a link displayed at any other

                          - - -

1    part of the account creation process --

2              MR. GROSS:  Object to the form.

3              MR. WADE-SCOTT:  -- conditions?

4              MR. GROSS:  Sorry.  Object to the form.

5              THE WITNESS:  There might be, but I'm

6         definitely sure that a link is displayed here.

7    BY MR. WADE-SCOTT:

8         Q.   Are you aware of any other place they're

9    displayed -- a link is displayed during the account

10   creation process?

11             MR. GROSS:  Object to the form.

12             THE WITNESS:  I'm not aware at the moment,

13        but I do know that they are definitely

14        displayed -- a link is definitely displayed

15        here.

16   BY MR. WADE-SCOTT:

17        Q.   Take a look at Exhibit B.

18        A.   Okay.

19        Q.   This is a screenshot of a sign-up page on

20   a different part of DoNotPay's website; is that

21   right?

22        A.   That's right.

23        Q.   This would have been displayed on

24   DoNotPay.com/login?

25        A.   That's correct.

_ - _

```
1         Q.    How about DoNotPay.com/connect?
2              MR. GROSS:  Object to the form.
3              THE WITNESS:  What's the question?
4    BY MR. WADE-SCOTT:
5         Q.    Would this page displayed in Exhibit B
6    have been shown at DoNotPay.com/connect?
7         A.    Would this page in Exhibit B have been
8    shown?
9              MR. GROSS:  Object to the form.  Sorry.
10        Excuse me.
11             THE WITNESS:  I don't understand the
12        question.
13   BY MR. WADE-SCOTT:
14        Q.    Okay.  So there's a screenshot of Exhibit
15   B, right?
16        A.    Yes.
17        Q.    That you recreated from DoNotPay's
18   records?
19        A.    Yes.
20        Q.    Is DoNotPay.com/login an exhaustive list
21   of where this would have been displayed, the image
22   in Exhibit B?
23             MR. GROSS:  Object to the form.
24             THE WITNESS:  I'm not sure.
25   BY MR. WADE-SCOTT:
```

          - - -

1      Q.   The image in Exhibit B is a screenshot of

2  part of DoNotPay's website; is that fair?

3          MR. GROSS:  Object to the form.

4          THE WITNESS:  It is a screenshot on some

5      URL structure of DoNotPay.com.

6  BY MR. WADE-SCOTT:

7      Q.   What device is this a screenshot from?

8          MR. GROSS:  Object to the form.

9          THE WITNESS:  I don't recall.

10         MR. WADE-SCOTT:  Paul, what's the form

11      objection that I'm running into here?

12         MR. GROSS:  There have been several, but,

13      that particular question, I don't know what you

14      mean by "what device".  Do you mean a computer?

15      Do you mean a web browser?  I just -- I don't

16      understand that.  It's vague.

17  BY MR. WADE-SCOTT:

18      Q.   Got it.  Mr. Kim, Exhibit B is a

19  screenshot from some kind of device, whether it be a

20  desktop, a phone, another kind of device in that

21  category I'm not thinking of; is that fair?

22      A.   Yes.

23      Q.   So using the same meaning that I just gave

24  you for "device," do you know what kind of device

25  Exhibit B was taken from?

```
                         - - -
 1        A.    It appears to be a desktop web browser,

 2   but, aside from that, I don't know.

 3        Q.    Do you know what web browser would have

 4   been used to create this screenshot?

 5        A.    I don't know.

 6        Q.    Did you create the screenshot that appears

 7   in Exhibit B?

 8            MR. GROSS:  Object to the form.

 9            THE WITNESS:  What does that mean, to

10       create?

11   BY MR. WADE-SCOTT:

12        Q.    Well, I'm looking at a screenshot.

13   Someone presumably created that screenshot; is that

14   fair?

15        A.    Yes.

16        Q.    Who created it?

17        A.    I believe I created it with the engineer I

18   mentioned previously, Tai Nguyen.

19        Q.    Do you know, between the two of you, who

20   actually took the screenshot?

21            MR. GROSS:  Object to the form.

22            THE WITNESS:  I don't recall.

23   BY MR. WADE-SCOTT:

24        Q.    When was the screenshot in Exhibit B

25   created?
```

                            - - -

1        A.    I believe it was around -- sometime in

2   April of this year.

3        Q.    Was there any other litigation going on

4   for which you were creating screenshots around April

5   of this year?

6            MR. GROSS:  Object to the form.  Eli,

7         what's the relevance here?

8            MR. WADE-SCOTT:  Mr. Kim's position is he

9         doesn't remember who created this screenshot.

10        I think it might have been a fairly notable

11        moment, and so I'm trying to prompt his

12        recollection about who did it.  So there's no

13        question there, so let me start again.

14   BY MR. WADE-SCOTT:

15       Q.    Mr. Kim, did you create this screenshot,

16   or did Mr. Nguyen?

17            MR. GROSS:  Object to the form.

18            THE WITNESS:  I don't remember.  We worked

19        together on it.

20   BY MR. WADE-SCOTT:

21       Q.    And you did not create this screenshot

22   with a phone, right?

23            MR. GROSS:  Object to the form.

24            THE WITNESS:  Yes, that's correct.

25   BY MR. WADE-SCOTT:

- - -

1     Q.   In the image displayed in Exhibit B of the

2  interrogatory responses, was there anything

3  underneath this content on the page as there would

4  have been for Exhibit A?

5     A.   I don't think so.

6     Q.   And if a user signing up for the first

7  time went through the screen in Exhibit B, would

8  they have encountered the same account creation

9  process that they would have if they went through

10  Exhibit A?

11          MR. GROSS:  Object to the form.

12          THE WITNESS:  I think so.

13  BY MR. WADE-SCOTT:

14     Q.   Which sign-up page did plaintiff use to

15  create DoNotPay accounts?

16          MR. GROSS:  Object to the form.

17          THE WITNESS:  Which sign-up screen --

18      could you repeat the question?

19  BY MR. WADE-SCOTT:

20     Q.   Yep.  So there's two sign-up screens that

21  DoNotPay provided to us, Exhibit A and Exhibit B,

22  which we just looked at.  Which one did plaintiff

23  use when he created his account or accounts?

24     A.   Plaintiff used both of them.

25     Q.   Do you know which one plaintiff used for

- - -

1  which accounts?

2      A.   I believe so, yes.

3      Q.   For the first account that plaintiff

4  created, which sign-up page did he encounter?

5          MR. GROSS:  Object to the form.

6          THE WITNESS:  The first account, he used

7          the one in Exhibit A.

8  BY MR. WADE-SCOTT:

9      Q.   For the second account, which screen would

10  he have encountered?

11      A.   The second account, we don't have that

12  information.

13      Q.   How about the third account?

14      A.   The third account, he used the screen from

15  Exhibit B.

16      Q.   And the fourth?

17      A.   For the fourth account, he used the screen

18  from Exhibit B.

19      Q.   Why doesn't DoNotPay know which screen he

20  encountered in the -- with the second account?

21      A.   To my knowledge, we turned off the

22  tracking code that's relevant for producing these

23  logs from around June 4th to June 18th, and I

24  believe the second account he signed up in that

25  interval.

                        - - -

1         Q.   Did that affect just plaintiff, or did

2    that affect other DoNotPay users, the tracking code

3    being turned off?

4              MR. GROSS:  Object to the form.

5              THE WITNESS:  It would affect other users

6         as well.

7    BY MR. WADE-SCOTT:

8         Q.   Would that have affected all users during

9    that period?

10             MR. GROSS:  Object to the form.

11             THE WITNESS:  Well, if the tracking code

12        was off, then the tracking portion would not be

13        relevant for all users.

14   BY MR. WADE-SCOTT:

15        Q.   So if the tracking code was off, that

16   would have impacted all users?

17             MR. GROSS:  Object to the form.

18             THE WITNESS:  I don't know what you mean

19        by "impacted".

20   BY MR. WADE-SCOTT:

21        Q.   Fair.  If the tracking code was off, that

22   would mean that no DoNotPay user at that point was

23   being tracked using that code?

24             MR. GROSS:  Object to the form.

25             THE WITNESS:  That's using that specific

- - -

1        code, but we have other ways to track users.

2        For example, when a user creates an account, we

3        will create a log of that elsewhere.

4  BY MR. WADE-SCOTT:

5        Q.   If you flip over to Exhibit D in the

6  interrogatory responses -- so just scroll down.

7  It's page 39.

8        A.   Okay.  I'm here.

9        Q.   What is Exhibit D?

10       A.   Exhibit D is -- these are the logs that

11  are produced by the tracking code that I mentioned

12  previously.

13       Q.   Where in these logs does it show which

14  screen Faridian viewed?

15            MR. GROSS:  Object to the form.

16            THE WITNESS:  If you look at the page

17       URL -- so for Account 1, you see "https,"

18       "DoNotPay.com/login?phone=5307865028".

19       That's -- and "&country=us".  That's the page

20       that has been loaded, and then the URL

21       following that is the page refer URL, which is

22       the URL that the user came from.  So the page

23       refer URL is https://DoNotPay.com/.  That shows

24       you that that was the previous screen that

25       Faridian came from.

- - -

1   BY MR. WADE-SCOTT:

2       Q.   Looking at the Account 1 of that log that

3   you were just looking at, there's text that says

4   "inner width" and "inner height".  Do you see that?

5       A.   Yes.

6       Q.   What does that refer to?

7       A.   That's the size of the device screen we

8   get from the -- I believe the window object in

9   JavaScript.

10       Q.   Are you able to tell from these event logs

11   what device plaintiff was using when he created his

12   accounts?

13       A.   To a degree.  So we can tell the operating

14   system, the browser.  When you say "device," there's

15   other pertinent information, maybe like location via

16   IP, et cetera.

17       Q.   So are you able to tell whether he logged

18   in from a phone or from a desktop?

19           MR. GROSS:  Object to the form.

20           THE WITNESS:  Yes, as long as it's in the

21     logs.

22   BY MR. WADE-SCOTT:

23       Q.   Okay.  So for the -- there are no logs for

24   Account 2, right?

25       A.   Well, not the ones produced by this

                        - - -

1    tracking code for accounts here, no.

2        Q.   Let's back up a step.  For purposes of

3    telling which device a user was using when they

4    encountered a page on DoNotPay, is there any other

5    tracking code that would identify the device other

6    than the one that produced the results we're looking

7    at right now?

8            MR. GROSS:  Object to the form.

9            THE WITNESS:  There might be, but I'm not

10       aware of any currently.

11   BY MR. WADE-SCOTT:

12       Q.   Okay.  So for Account 1, which device was

13   plaintiff using when he created the account?

14       A.   I believe he was using a mobile device.

15       Q.   Are you able to tell what kind?

16           MR. GROSS:  Object to the form.

17           THE WITNESS:  It appears to be an Android

18       device.

19   BY MR. WADE-SCOTT:

20       Q.   How can you tell?

21       A.   In the logs there's the operating system

22   followed by "Android 11" if you look at the field

23   after "644422".

24       Q.   For Account 3, the next account for which

25   the tracking software results are available, can you

                              - - -

1   tell what device plaintiff was using when he logged

2   in?

3           MR. GROSS:  Object to the form.

4           THE WITNESS:  It appears to be a desktop

5       device.

6   BY MR. WADE-SCOTT:

7       Q.   What's that based on?

8       A.   It's based on the -- it's based on the --

9   several things; the inner width, inner height of the

10  device.  It's outside the bounds of a mobile device.

11      Q.   Are you able to tell which model of phone

12  plaintiff used when he created Account 1?

13          MR. GROSS:  Object to the form.

14          THE WITNESS:  I believe it was an Android.

15  BY MR. WADE-SCOTT:

16      Q.   Are you able to tell which kind of Android

17  phone plaintiff used?

18          MR. GROSS:  Object to the form.

19          THE WITNESS:  I'm not sure.

20  BY MR. WADE-SCOTT:

21      Q.   Are you not sure what model he used, or

22  are you not sure whether you were able to tell what

23  model plaintiff used?

24      A.   It appears to be an Android device.

25      Q.   Sure.  I'm asking a different question.

- - -

1  So there's a bunch of different models of Android

2  devices.  A few examples off the top of my head are

3  a Google Pixel and a Samsung Galaxy.  From that

4  category of models of Android phones, are you able

5  to tell what model plaintiff used?

6          MR. GROSS:  Object to the form.

7          THE WITNESS:  From these logs here, I am

8      not sure.

9  BY MR. WADE-SCOTT:

10      Q.   Does DoNotPay have other logs that would

11  show that?

12          MR. GROSS:  Object to the form.

13          THE WITNESS:  There might be, but I'm not

14      aware of them at the moment.

15  BY MR. WADE-SCOTT:

16      Q.   Referring to Account 1, when plaintiff

17  evidently created the account on a phone, are you

18  able to tell if plaintiff actually saw the hyperlink

19  to the terms?

20          MR. GROSS:  Object to the form.

21          THE WITNESS:  I'm not sure.

22  BY MR. WADE-SCOTT:

23      Q.   Generally speaking, not just for

24  plaintiff, but for a user that encounters this

25  screen, DoNotPay gets information about how large

- - -

1    the device screen is from the inner width and inner

2    height fields; is that fair?

3              MR. GROSS:  Object to the form.

4              THE WITNESS:  When the tracking log is

5        active, we do, yes.

6    BY MR. WADE-SCOTT:

7        Q.   So DoNotPay should be able to tell what

8    part of the DoNotPay website was contained in the

9    screen at the time?

10             MR. GROSS:  Object to the form.

11             MR. WADE-SCOTT:  Sorry.  Go ahead.

12             THE WITNESS:  I don't know.

13   BY MR. WADE-SCOTT:

14       Q.   Does DoNotPay collect a data field called

15   international mobile subscriber identity or IMSI?

16             MR. GROSS:  Object to the form.

17             THE WITNESS:  I don't know.

18   BY MR. WADE-SCOTT:

19       Q.   Have you ever heard that data type before,

20   IMSI?

21             MR. GROSS:  Object to the form.

22             THE WITNESS:  I may have, but I don't

23       recall.

24   BY MR. WADE-SCOTT:

25       Q.   Does DoNotPay collect international mobile

                              - - -
1    equipment identities or IMEIs?

2              MR. GROSS:  Object to the form.

3              THE WITNESS:  I'm not sure.

4    BY MR. WADE-SCOTT:

5         Q.   Who would know if DoNotPay collects either

6    IMSIs or IMEIs?

7              MR. GROSS:  Object to the form.

8              THE WITNESS:  I'm not sure.

9    BY MR. WADE-SCOTT:

10        Q.   Of the less than ten full-time employees

11   at DoNotPay, which of them would be most likely to

12   know whether DoNotPay collects IMSIs or IMEIs?

13             MR. GROSS:  Object to the form.

14             THE WITNESS:  I'm not sure.

15   BY MR. WADE-SCOTT:

16        Q.   Even among that small group, you do not

17   know who would know that information?

18             MR. GROSS:  Object to the form.

19             THE WITNESS:  Yes.

20   BY MR. WADE-SCOTT:

21        Q.   Does DoNotPay have data showing whether

22   plaintiff actually clicked on any of the hyperlinks

23   going to the terms and conditions?

24             MR. GROSS:  Object to the form.

25             THE WITNESS:  I'm not certain.

                                  - - -

1            MR. WADE-SCOTT:  Hold on one second.  What
2       was the form objection there, Paul?
3            MR. GROSS:  I don't know.  Vagueness,
4       relevance.
5            MR. WADE-SCOTT:  Certainly, it can't be
6       relevance.  Okay.  Let me try again.
7    BY MR. WADE-SCOTT:
8       Q.   Of the hyperlinks that are displayed with
9    the terms and conditions in Exhibits A and B, does
10   DoNotPay have data showing whether plaintiff
11   actually clicked on any of them?
12           MR. GROSS:  Object to the form.
13           THE WITNESS:  I'm not sure.
14   BY MR. WADE-SCOTT:
15      Q.   If you scroll up to the interrogatories
16   here, the actual interrogatory responses, and go to
17   the response to Interrogatory 2...
18      A.   Okay.
19      Q.   Do you see -- the response that spans
20   pages three and four, on page four, DoNotPay
21   responded, "In the ordinary course of business, DNP
22   stores every page viewed by a user with the
23   following parameters," and then it lists the
24   parameters.  Do you see that?
25      A.   I do see that.

                                - - -

1        Q.    So if DoNotPay stores every page viewed by

2    a user, wouldn't DoNotPay know whether or not

3    plaintiff viewed the terms and conditions?

4              MR. GROSS:  Object to the form.

5              THE WITNESS:  Could you repeat the

6        question?

7    BY MR. WADE-SCOTT:

8        Q.    Sure.  So you claimed in response to these

9    interrogatories that, "In the ordinary course of

10   business, DNP stores every page viewed by a user

11   with the following parameters," and then it lists

12   the parameters.  My question is, if that is true and

13   DoNotPay stores every page viewed, wouldn't DoNotPay

14   know whether or not plaintiff had actually viewed

15   the terms and conditions page?

16             MR. GROSS:  Object to the form.

17             THE WITNESS:  I'm not sure.  I can't

18       assume on behalf of the company that it

19       would -- the company would know.

20   BY MR. WADE-SCOTT:

21       Q.    Okay.  Are you able to tell whether

22   plaintiff viewed the terms and conditions?

23             MR. GROSS:  Object to the form.

24             THE WITNESS:  It might be possible, but I

25       don't have any knowledge of that.

                                 - - -

1   BY MR. WADE-SCOTT:

2        Q.   Sitting here today, you have no idea if

3   plaintiff viewed the terms and conditions of

4   DoNotPay?

5        A.   I don't recall if plaintiff ever viewed

6   the terms of service page.

7        Q.   And is it, in fact, true that DoNotPay

8   stores every page viewed by a user?

9             MR. GROSS:  Object to the form.

10            THE WITNESS:  To my knowledge, as long as

11        the tracking script is live and running,

12        DoNotPay stores every page viewed by the user.

13  BY MR. WADE-SCOTT:

14       Q.   So if the tracking script is live and

15  running, DoNotPay should be able to tell whether a

16  user, including plaintiff, viewed the terms and

17  conditions, right?

18            MR. GROSS:  Object to the form.

19            THE WITNESS:  If the tracking script is

20        live and running, it should be able to, yes.

21  BY MR. WADE-SCOTT:

22       Q.   Do you have any data about whether users

23  have clicked on the terms and conditions in the

24  past?

25            MR. GROSS:  Object to the form.

- - -

1          THE WITNESS:  Do we have any data?  I'm

2      not sure.

3   BY MR. WADE-SCOTT:

4      Q.   Do you know how many of DoNotPay's users

5   have clicked on the terms and conditions -- sorry.

6   Let me rephrase that.  Do you know how many DoNotPay

7   users have viewed the terms and conditions page?

8      A.   I don't know.

9      Q.   Do you think that DoNotPay users generally

10  read the terms and conditions page?

11          MR. GROSS:  Object to the form.

12          THE WITNESS:  I don't know.

13          MR. WADE-SCOTT:  Let's go off the record,

14      take just a five-minute break here.

15          MR. GROSS:  Sounds good.

16          THE TECHNICIAN:  Okay.  I'll go and read

17      us off.  The time is 10:56 a.m. Central Time.

18      We are now off the record.

19                        - - -

20          (Whereupon there was a recess in the

21      proceeding from 10:56 a.m. to 11:01 a.m.)

22                        - - -

23          THE TECHNICIAN:  The time is 11:01 a.m.

24      Central Time.  We are now back on the record.

25  BY MR. WADE-SCOTT:

- - -

1    Q.   Mr. Kim, did you discuss the substance of

2  your testimony with your attorneys while you were on

3  the break?

4    A.   Absolutely not.

5    Q.   In the interrogatory document, if you

6  scroll down to Exhibit C, the terms...

7    A.   Okay.

8    Q.   Were these the terms of service that were

9  in force each time plaintiff created an account?

10    A.   I know it was in place -- actually, I'm

11  not sure if it was for each time.

12    Q.   Okay.  What were the dates on which you

13  said plaintiff created accounts?

14    A.   The dates?  So I believe there was an

15  account that was created --

16        MR. GROSS:  Andrew, sorry to interrupt,

17     but if you need to refer to the interrogatory

18     responses or your declaration, that's

19     acceptable.

20        THE WITNESS:  Oh, okay.

21  BY MR. WADE-SCOTT:

22    Q.   So, Mr. Kim, let me ask again, and you can

23  just -- you can refer to a document.  Just let me

24  know which document you're referring to.  So which

25  dates did you say that plaintiff created accounts?

                                    - - -

1         A.   Let me refer to -- okay.  I'm referring to

2    the Declaration of Andrew Kim in Support of

3    Defendant.  May 17th, 2021, approximately 9:35 a.m.;

4    June 17th, 2021, approximately 11:05 a.m.; July 2nd,

5    2021, 9:43 p.m.; and March 28th, 2022 at

6    approximately 3:44 a.m.

7         Q.   Looking back to the terms that are added

8    as an exhibit to the interrogatory responses, are

9    these the terms that would have been in force at

10   each of those times you just read?

11        A.   To my knowledge, I think so, yes.

12        Q.   If you scroll down to the arbitration

13   provision -- let me know when you're there.

14             MR. GROSS:  It's on PDF page 14 of your

15        declaration, just to help you.  It's long.

16             MR. WADE-SCOTT:  Yeah.  Let's -- actually,

17        it's PDF page 20 of the interrogatories, which

18        is the one I was just referring to --

19             MR. GROSS:  Sure, okay.

20             MR. WADE-SCOTT:  -- for clarity.

21             MR. GROSS:  Sure.

22   BY MR. WADE-SCOTT:

23        Q.   The terms attached to the interrogatory

24   responses and the terms attached to your declaration

25   are the same, right?

- - -

1      A.   Yeah, I'm here.

2      Q.   Sorry.  And the two -- the documents, the

3  terms that are attached to your declaration and

4  attached to the interrogatories, those are the same,

5  right?

6      A.   Yes.

7      Q.   All right.  Do you see the section on page

8  20 of the interrogatory responses concerning

9  opt-out?

10     A.   Concerning opt-out.  Let's see.  Yup, I

11  see it.

12     Q.   Summarizing, this says you can opt out if

13  you send written notice to an address, 164 Townsend

14  Street in San Francisco; is that fair?

15     A.   Yes, I see the address.

16     Q.   What was that address, 164 Townsend

17  Street, Unit 2?

18     A.   That used to be the address of our office

19  in San Francisco.

20     Q.   Does DoNotPay receive mail there today?

21     A.   Yes, to my knowledge.

22     Q.   Who would get opt-out notices sent to that

23  address?

24          MR. GROSS:  Object to the form.

25          THE WITNESS:  Sorry.  I don't understand

- - -

1      the question.

2   BY MR. WADE-SCOTT:

3      Q.   Sure.  Was there a DoNotPay employee

4   responsible for collecting opt-out notices that were

5   sent to the Townsend Street address?

6      A.   It's my understanding that there's a

7   procedure and system in place to receive opt-out

8   requests.

9      Q.   What's that procedure and system?

10      A.   What is the what?  Sorry.

11      Q.   What's the procedure and system you just

12   mentioned to receive opt-out requests?

13      A.   I don't know the exact details, but I know

14   that there's a procedure in place to receive opt-out

15   requests, specifically arbitration opt-out requests.

16      Q.   Who would know what that procedure was?

17      A.   I'm not sure.

18      Q.   Of the less than ten DoNotPay employees,

19   you don't know who would know about the arbitration

20   opt-out procedures?

21           MR. GROSS:  Object to the form.

22           THE WITNESS:  I'm not sure.

23   BY MR. WADE-SCOTT:

24      Q.   So it's your position that DoNotPay can

25   accept mail at the Townsend Street address today?

- - -

1          MR. GROSS:  Object to the form.

2          THE WITNESS:  I'm not sure about that one.

3      I think the terms of service has changed, but,

4      yeah, I don't really get what type of question

5      you're asking, but, to my understanding, we

6      have a new address in our terms of service.

7   BY MR. WADE-SCOTT:

8      Q.   You said that DoNotPay used to be located

9   at that address on Townsend Street, right?

10     A.   That's right.

11     Q.   But DoNotPay is not located there anymore?

12         MR. GROSS:  Object to the form.

13         THE WITNESS:  Well, DoNotPay -- our HQ

14     isn't there, but, yeah, we still accept mail.

15  BY MR. WADE-SCOTT:

16     Q.   To that address?

17     A.   I believe so, yes.

18     Q.   Are you aware of mail being undeliverable

19  to that address at any point?

20         MR. GROSS:  Object to the form.

21         THE WITNESS:  I'm not sure, but I

22     understand that there is a system in place to

23     accept arbitration opt-out requests.

24  BY MR. WADE-SCOTT:

25     Q.   Okay.  At the point in time that these

– – –

1  terms of service, the ones we're looking at now,

2  were in effect, was part of that procedure taking

3  mail for these opt-out requests at 164 Townsend

4  Street?

5        MR. GROSS:  Object to the form.

6        THE WITNESS:  Could you rephrase the

7     question, please?

8  BY MR. WADE-SCOTT:

9     Q.   Sure.  During the time period that these

10  were the applicable terms of service, could DoNotPay

11  receive opt-out requests at that address?

12     A.   To my understanding, while this

13  arbitration provision was in effect during all

14  applicable times in the terms of service, there was

15  a procedure in place to accept arbitration opt-out

16  requests.

17     Q.   Sure.  My question's a little bit

18  different.  Could you receive an opt-out request at

19  that address?

20        MR. GROSS:  Object to the form.

21        THE WITNESS:  To my understanding, while

22     the arbitration provision was in the terms of

23     service at all applicable times, there was a

24     procedure in place to accept arbitration

25     opt-out requests.

- - -

1  BY MR. WADE-SCOTT:

2      Q.  Yeah.  And, with respect, you said that a

3  few times.  I get that there was a procedure.  My

4  question is, this provision says you have to send a

5  notice to that address, and I want to know if

6  DoNotPay could actually receive those opt-out

7  requests at that address.  Do you know if they

8  could?

9          MR. GROSS:  Object to the form.

10          THE WITNESS:  I don't know the specific

11      details, but I do know that there was a

12      procedure in place during all applicable times

13      the arbitration provision was in the terms of

14      service to accept opt-out requests.

15  BY MR. WADE-SCOTT:

16      Q.  Sure.  So you don't know if DoNotPay could

17  receive mail at that address?

18          MR. GROSS:  Object to the form.

19          THE WITNESS:  Same answer as the previous

20      one.

21  BY MR. WADE-SCOTT:

22      Q.  Show you a document that'll be marked as

23  Exhibit 4.  Yes, we're going a little bit out of

24  order here.  Go ahead and open that up.

25      A.  Okay, I have it open.

- - -

1        Q.   If you scroll down to the same -- well,

2   actually, sorry.  Let me restart.  Do you recognize

3   the terms of service in front of you?

4        A.   Yes.  I see that there is a DoNotPay terms

5   of service in front of me.

6        Q.   This says it was last updated in July of

7   2021 -- July 6th, 2021.  Are you familiar with this

8   terms of service that was updated in July?

9             MR. GROSS:  Object to the form.

10            THE WITNESS:  I'm not sure.

11   BY MR. WADE-SCOTT:

12       Q.   Sitting here today, do you know whether or

13   not there was a terms of service that was updated in

14   July 2021?

15       A.   I don't recall.

16       Q.   If, in fact, DoNotPay updated the terms in

17   July 2021, would those have been the applicable

18   terms when plaintiff created an account in 2022?

19            MR. GROSS:  Object to the form.

20            THE WITNESS:  I don't know.  I'm not

21       familiar with the terms of service updates.

22   BY MR. WADE-SCOTT:

23       Q.   If you go down to the same provision

24   concerning arbitration...

25       A.   What page is that on?

- - -

1      Q.    Seven.

2      A.    Okay, I'm here.

3      Q.    The same address is there for the opt-out

4    procedure; is that fair, Townsend Street?

5      A.    Yes.

6      Q.    And in July of 2021, was DoNotPay

7    accepting mail at that Townsend Street address?

8            MR. GROSS:  Object to the form.

9            THE WITNESS:  It's my understanding that

10       at all applicable times this arbitration

11       provision was in effect, there was a process in

12       place to accept arbitration opt-out requests.

13   BY MR. WADE-SCOTT:

14     Q.    Yeah.  My question was more general.  Was

15   DoNotPay accepting mail in July 2021 at the Townsend

16   Street address?

17     A.    It's my understanding that at all times

18   where the arbitration provision was in the terms of

19   service, there was a process in place.

20     Q.    To accept mail at that address?

21     A.    It's my understanding that at all

22   applicable times there was a process in place while

23   the arbitration provision was in the terms of

24   service.

25     Q.    Did DoNotPay cease operations at the

- - -

1  Townsend Street address at some point?

2          MR. GROSS:  Object to the form.

3          THE WITNESS:  Sorry.  Could you rephrase

4      the question?

5  BY MR. WADE-SCOTT:

6      Q.   Did DoNotPay cease operations at the

7  Townsend Street address in San Francisco at some

8  point?

9      A.   What does "cease operations" mean?

10      Q.   Did DoNotPay stop occupying that address

11  in any respect at some point?

12          MR. GROSS:  Object to the form.

13          THE WITNESS:  Occupying the address?  I

14      don't understand the question.

15  BY MR. WADE-SCOTT:

16      Q.   Sure.  Do any employees work out of the

17  Townsend Street address today?

18          MR. GROSS:  Object to the form.

19          THE WITNESS:  What do you mean by "work"?

20  BY MR. WADE-SCOTT:

21      Q.   Does any employee of DoNotPay go into the

22  Townsend Street address for any reason, to your

23  knowledge?

24      A.   I believe so, yes.

25      Q.   Does DoNotPay still pay rent for the

- - -

1   Townsend Street address?

2          MR. GROSS:  Object to the form.

3          THE WITNESS:  Yes, I believe so.

4   BY MR. WADE-SCOTT:

5      Q.   Does DoNotPay pay utilities at the

6   Townsend Street address?

7          MR. GROSS:  Object to the form.

8          THE WITNESS:  No, we don't.

9   BY MR. WADE-SCOTT:

10     Q.   Are you aware that Mr. Browder, the CEO of

11  DoNotPay, has claimed that the company was ending

12  operations in San Francisco?

13         MR. GROSS:  Eli, these questions are

14      clearly about subject matter jurisdiction, not

15      arbitration subject to this deposition, so I'd

16      ask that you stay focused on the agreed-upon

17      subjects for this deposition.

18         MR. WADE-SCOTT:  Yeah, I appreciate that.

19      I'm actually just trying to figure out if

20      DoNotPay could actually accept mail at this

21      address, which Mr. Kim has responded repeatedly

22      that he's aware of some procedure, but won't

23      answer whether or not they accepted mail.  So

24      I'm trying to figure out to the extent this

25      office was actually operational.  This isn't

- - -

1       about subject matter jurisdiction at all.

2           MR. GROSS:  One way or the other, do you

3       know if DNP accepted mail at this address?

4           THE WITNESS:  Sorry.  What was the

5       question?

6           MR. GROSS:  Do you know one way or the

7       other whether DoNotPay accepted mail at this

8       address --

9           THE WITNESS:  Yes.

10          MR. GROSS:  -- operations?

11          MR. WADE-SCOTT:  Sorry.  It broke up.  Did

12      he say yes?

13          THE COURT REPORTER:  I believe so.  Did

14      you say yes, sir?

15          THE WITNESS:  Yes.

16  BY MR. WADE-SCOTT:

17      Q.   Okay.  Has DoNotPay ever stopped receiving

18  mail at that address, to your knowledge?

19      A.   I'm not sure.  I just know there's a

20  procedure in place to accept arbitration opt-out

21  requests during all applicable times that the

22  provision was in place in the terms of service.

23      Q.   Are you aware of any arbitration opt-out

24  requests being returned as undeliverable from the

25  Townsend Street address?

                              - - -

1          MR. GROSS:  Object to the form.

2          THE WITNESS:  I don't recall, but I do

3     know that, at all applicable times the

4     arbitration provision was in the terms of

5     service, there was a procedure in place to

6     accept arbitration opt-out requests.

7          MR. WADE-SCOTT:  I just deleted the

8     version of Exhibit 4 because there was a

9     highlight that we left in there.  I'm gonna

10    upload a clean version.  That will be Exhibit

11    4.  Emily Penkowski's gonna do that, and then

12    I'll keep moving.

13         MR. GROSS:  So this is no longer going to

14    be Exhibit 4.  There's gonna be a replacement

15    version; is that right?

16         MR. WADE-SCOTT:  There's a replacement

17    version.  I'll just save everyone some time.

18    I'll represent it's exactly the same minus a

19    highlight.

20         MR. GROSS:  Okay.  And I see that it's

21    now -- looks like it's now appeared in the

22    chat.

23    BY MR. WADE-SCOTT:

24    Q.    All right.  And I'm gonna upload what will

25    be Exhibit 3, just doubling back.  Let me know when

- - -

1   you have that open.

2       A.   All right, I have it open.

3       Q.   Do you recognize Exhibit 3?

4       A.   It appears to be a DoNotPay.com URL.

5       Q.   Were you able, during the time period that

6   plaintiff was signing up for DoNotPay accounts, to

7   sign up for the service via mobile phone?

8       A.   I believe so, yes.

9       Q.   I can make that way simpler, actually.

10  You earlier testified that plaintiff, in fact,

11  signed up with his first account via mobile phone

12  based on DoNotPay's records; is that right?

13      A.   Yes.

14           THE COURT REPORTER:  I'm sorry.  Did you

15      object, Mr. Gross?

16           MR. GROSS:  I did.

17  BY MR. WADE-SCOTT:

18      Q.   When a user opens DoNotPay.com via mobile

19  phone, or did at the time plaintiff was signing up

20  for his accounts, was DoNotPay able to tell if the

21  hyperlink to the terms of service was actually

22  visible in a user's screen?

23      A.   I'm not sure.

24           MR. GROSS:  Excuse me.  I'm sorry.  Object

25      to the form.

- - -

1   BY MR. WADE-SCOTT:

2       Q.   You said you're not sure?

3       A.   Yes.

4       Q.   So it was possible for a user to open up a

5   DoNotPay login screen, for example, on a DoNotPay

6   browser and not even have the hyperlink visible in

7   the screen; is that --

8           MR. GROSS:  Object to the form.

9           THE WITNESS:  I'm not sure.

10  BY MR. WADE-SCOTT:

11      Q.   Take a look at Exhibit 3, which we agree

12  was the -- is a representation of the DoNotPay.com

13  website.

14          MR. GROSS:  Object to the form.

15  BY MR. WADE-SCOTT:

16      Q.   Sorry.  Let's take one step back.  You

17  said earlier that Exhibit 3 appeared to be

18  DoNotPay's website; is that right?

19      A.   It appeared --

20          MR. GROSS:  Object to the form.  Excuse

21      me.  I'm sorry.

22          THE WITNESS:  It appears to be the

23      DoNotPay.com URL loaded into a browser.

24  BY MR. WADE-SCOTT:

25      Q.   Does this look like it was loaded into a

- - -

1  mobile browser?

2          MR. GROSS:  Object to the form.

3          THE WITNESS:  Yes.

4  BY MR. WADE-SCOTT:

5      Q.   And the terms link is not visible in this

6  screenshot?

7      A.   In this screenshot the terms link is not

8  visible, yes.

9      Q.   Do you agree that it's possible for a user

10  to have pulled up the sign-up page and entered their

11  email on a screen like this one without seeing the

12  link to the terms?

13          MR. GROSS:  Object to the form.

14          THE WITNESS:  I'm not sure.

15  BY MR. WADE-SCOTT:

16      Q.   If a user pulled up the DoNotPay website

17  on their mobile phone, as appears in Exhibit 3,

18  could they enter their email here and click the

19  button without ever seeing the terms link?

20          MR. GROSS:  Object to the form.

21          THE WITNESS:  I'm not sure.

22  BY MR. WADE-SCOTT:

23      Q.   Do you see the terms link in this

24  screenshot represented in Exhibit 3?

25          MR. GROSS:  Object to the form.

- - -

1        THE WITNESS:  I don't see the terms link.

2    BY MR. WADE-SCOTT:

3        Q.   But the email or phone number field and

4    the sign-up button are both visible and accessible,

5    right?

6        MR. GROSS:  Object to the form.

7        THE WITNESS:  They're both visible.

8    BY MR. WADE-SCOTT:

9        Q.   You could put your email in here and hit

10    "sign up"?

11        MR. GROSS:  Object to the form.

12        THE WITNESS:  I'm not sure.

13    BY MR. WADE-SCOTT:

14        Q.   Does DoNotPay maintain records of what the

15    login screen -- sorry.  Let me restart that.  Does

16    DoNotPay maintain records of what the sign-up screen

17    looked like on different devices, meaning desktop

18    versus mobile phone?

19        A.   Could you repeat the question?

20        Q.   Does DoNotPay maintain records of what the

21    sign-up screen looked like on different devices?

22        A.   I'm not sure.

23        Q.   Does the way the sign-up screen is

24    displayed change between different device types?

25        A.   What do you mean by "the way that the

- - -

1  sign-up screen is displayed"?

2       Q.   Does the type of device used to access the

3  sign-up screen change what is visible in the screen?

4       A.   I'm not sure.

5       Q.   If you pull the DoNotPay website up on a

6  desktop, you're going to see more of the sign-up

7  screen than you do on a mobile phone?

8            MR. GROSS:  Object to the form.

9            THE WITNESS:  I don't have an opinion on

10       that.

11  BY MR. WADE-SCOTT:

12       Q.   You don't know whether or not the screen

13  on a mobile phone shows less than a screen on a

14  desktop?

15            MR. GROSS:  Object to the form.

16            THE WITNESS:  I don't know what you mean

17       by "shows more" or "shows less".  I think

18       that's -- I don't have an opinion on that.

19  BY MR. WADE-SCOTT:

20       Q.   Are you aware that different phones have

21  different screen sizes?

22            MR. GROSS:  Object to the form.

23            THE WITNESS:  Yes.

24  BY MR. WADE-SCOTT:

25       Q.   Does the screen size on a phone affect

- - -

1    what parts of a web page are displayed?

2         A.   Could you repeat the question?

3         Q.   Does the screen size of a phone affect

4    what parts of a web page are displayed to the user?

5              MR. GROSS:  Object to the form.

6              THE WITNESS:  Well, that would depend

7         on -- that would just depend on how, I guess,

8         the screen page is created.  I don't know.

9         It's too broad of a question.

10   BY MR. WADE-SCOTT:

11        Q.   If a phone has a smaller screen, is it

12   possible that, when viewing the sign-up page, a user

13   would not see the terms link?

14             MR. GROSS:  Object to the form.

15             THE WITNESS:  I'm not sure.  Could be

16        zoomed in or zoomed out.

17   BY MR. WADE-SCOTT:

18        Q.   Sure.  So setting aside zoom or

19   resolution, is it possible that a phone with a

20   smaller screen would not display the terms link of

21   the DoNotPay sign-up page?

22             MR. GROSS:  Object to the form.

23             THE WITNESS:  I'm not sure.

24   BY MR. WADE-SCOTT:

25        Q.   Is that something that DoNotPay tested, to

                              - - -
1    your knowledge?

2              MR. GROSS:  Object to the form.

3              THE WITNESS:  Don't recall.

4    BY MR. WADE-SCOTT:

5         Q.   Is that something that you would know, or

6    would someone else know at DoNotPay?

7              MR. GROSS:  Object to the form.

8              THE WITNESS:  I'm not sure.

9    BY MR. WADE-SCOTT:

10        Q.   Did you design the DoNotPay sign-up page?

11             MR. GROSS:  Object to the form.

12             THE WITNESS:  Partially.

13   BY MR. WADE-SCOTT:

14        Q.   Did you decide where the link to the terms

15   of service would go?

16        A.   I don't recall.

17        Q.   When was the sign-up page in Exhibit A and

18   Exhibit B created?

19             MR. GROSS:  Object to the form.

20             THE WITNESS:  I don't remember exactly,

21        but several years ago.

22   BY MR. WADE-SCOTT:

23        Q.   Who was involved with the creation of the

24   sign-up pages in Exhibits A and B?

25             MR. GROSS:  Object to the form.

                         - - -

1           THE WITNESS:  Don't remember.

2  BY MR. WADE-SCOTT:

3     Q.  How many employees did DoNotPay -- let me

4  restart that.  How many full-time employees of

5  DoNotPay worked at the company at the time these

6  sign-up pages were created?

7           MR. GROSS:  Object to the form.

8           THE WITNESS:  I don't remember.

9  BY MR. WADE-SCOTT:

10    Q.  Think it was less than ten?

11    A.  I'm not sure.

12    Q.  So there are less than ten now, right?

13    A.  Yes.

14    Q.  Is it likely that there were more than ten

15  at that earlier time?

16           MR. GROSS:  Object to the form.

17           THE WITNESS:  I don't recall.

18  BY MR. WADE-SCOTT:

19    Q.  What earlier time are we talking about?

20  Can you get any more specific than "several years

21  ago"?

22           MR. GROSS:  Object to the form.

23           THE WITNESS:  I don't remember exactly.

24  BY MR. WADE-SCOTT:

25    Q.  Does DoNotPay have a mobile application?

                            - - -

1                MR. GROSS:  Object to the form.

2                THE WITNESS:  Yes, we have a mobile

3        application.

4    BY MR. WADE-SCOTT:

5        Q.   What platform is the mobile application

6    available on?

7        A.   It's available on iOS and Android.

8        Q.   Does DoNotPay maintain images of what the

9    mobile application sign-up flow looked like?

10               MR. GROSS:  Object to the form.

11               THE WITNESS:  I'm not sure.

12   BY MR. WADE-SCOTT:

13       Q.   Have you had any role in the design of the

14   mobile application?

15       A.   I don't recall.

16       Q.   Who at DoNotPay works or worked on the

17   DoNotPay mobile app?

18               MR. GROSS:  Object to the form.

19               THE WITNESS:  I don't know.

20   BY MR. WADE-SCOTT:

21       Q.   Who would know the answer to that

22   question?

23       A.   I'm not sure.

24       Q.   Does the mobile app not fall under your

25   purview as the vice president of product?

                          - - -

1          MR. GROSS:  Object to the form.

2          THE WITNESS:  It may have in the past, but

3     not currently.

4  BY MR. WADE-SCOTT:

5     Q.   So did you work on it in the past?

6          MR. GROSS:  Object to the form.

7          THE WITNESS:  Don't recall.

8  BY MR. WADE-SCOTT:

9     Q.   Did you work on the user design in any

10 respect of the mobile application?

11         MR. GROSS:  Objection.

12         THE WITNESS:  I may have in the past, but

13    I don't recall.

14         MR. WADE-SCOTT:  Okay.  Let's take another

15    five-minute break.

16         MR. GROSS:  Eli, do you have a sense of

17    how you're doing on time, how much more you

18    have?  We've been going almost 90 minutes.

19         MR. WADE-SCOTT:  Yeah.  It's taking a

20    little bit longer than anticipated because

21    Mr. Kim doesn't seem to remember much.  That

22    said, I can't imagine I have more than 20 more

23    minutes.

24         MR. GROSS:  Okay.  You know, that's -- I

25    think we take issue with the -- are we off the

                              - - -

1    record?  Can we go off the record, please?

2         THE TECHNICIAN:  Okay.  I'll read us off.

3    The time is 11:37 a.m. Central Time.  We are

4    now off the record.

5                              - - -

6         (Whereupon there was a recess in the

7    proceeding from 11:37 a.m. to 11:48 a.m.)

8                              - - -

9         THE TECHNICIAN:  The time is 11:48 a.m.

10   Central Time.  We are now back on the record.

11        MR. GROSS:  Thank you.  Before the

12   deposition, the parties agreed that they would

13   endeavor to keep this deposition to roughly 90

14   minutes.  Throughout the deposition,

15   plaintiff's counsel has asked Mr. Kim numerous

16   questions that have nothing to do with whether

17   plaintiff agreed to arbitrate, which the

18   parties expressly agreed would not be a subject

19   of the deposition.  As a result, we've decided

20   that we'll allow ten more minutes of

21   questioning of Mr. Kim, at which point we will

22   not permit Mr. Kim to answer any further

23   questions.  With that, I pass the witness back

24   to plaintiff's counsel.

25        MR. WADE-SCOTT:  Okay.  Plaintiff's

- - -

1      counsel's perspective is that if there were any

2      objections to the subject matter of this

3      deposition -- I recall exactly one of them,

4      which I think we got through rather smoothly --

5      and to the extent that we're over 90 minutes,

6      which I think the record makes clear, Mr. Kim

7      has not been all that forthcoming a deponent.

8      He doesn't recall many fairly obvious things,

9      and I've had to explain a number of very basic

10     steps in my questioning.  I'm sure we have some

11     kind of disagreement about that.  However, if

12     defendant wants to terminate the deposition,

13     that is their prerogative, and we reserve the

14     right to reopen it.

15          MR. GROSS:  Very well.

16   BY MR. WADE-SCOTT:

17        Q.   Okay.  Mr. Kim, we were talking about

18   opting out of the arbitration provision and the

19   address in California.  You said that you're aware

20   that there was a procedure in place for accepting

21   arbitration opt-outs?

22        A.   Yes.  While the -- while the arbitration

23   provision was in the terms of service at all

24   applicable times, there was a procedure in place to

25   accept arbitration opt-out requests.

- - -

1      Q.   Right.  You said that almost verbatim a

2   number of times.  Who told you to say that?

3           MR. GROSS:  Object to the form.

4           THE WITNESS:  No one.

5   BY MR. WADE-SCOTT:

6      Q.   You came up with that line yourself?

7           MR. GROSS:  Object to the form.

8           THE WITNESS:  I believe so.

9   BY MR. WADE-SCOTT:

10     Q.   How are you aware that there was a

11  procedure in place at all relevant times?

12     A.   How am I aware?  I'm not sure how I'm

13  aware, but I am.

14     Q.   What was the procedure for accepting

15  opt-outs?

16          MR. GROSS:  Object to the form.

17          THE WITNESS:  I don't know the precise

18      details, but I do know there was a procedure in

19      place for accepting arbitration opt-out

20      requests while the arbitration provision was in

21      the terms of service at all applicable times.

22  BY MR. WADE-SCOTT:

23     Q.   Okay.  So you weren't in charge of that

24  procedure, were you?

25          MR. GROSS:  Object to the form.

                    _ _ _

1          THE WITNESS:  Could you repeat the

2     question?

3  BY MR. WADE-SCOTT:

4     Q.  Were you in charge of that procedure in

5  any respect?

6     A.  I wasn't.

7     Q.  So how do you know that there was a

8  procedure in place?

9          MR. GROSS:  Object to the form.

10         THE WITNESS:  I know that there was a

11     procedure in place.

12  BY MR. WADE-SCOTT:

13     Q.  Who told you that there was a procedure in

14  place?

15         MR. GROSS:  Object to the form.

16         THE WITNESS:  I don't recall.

17  BY MR. WADE-SCOTT:

18     Q.  But you're sure that there was?

19         MR. GROSS:  Object to the form.

20         THE WITNESS:  At all applicable times

21     while the arbitration provision was in the

22     terms of service, I understand that there was a

23     procedure in place to accept arbitration

24     opt-out requests.

25  BY MR. WADE-SCOTT:

- - -

1  Q.  Are you aware of any problems at any point

2  with the procedure for accepting arbitration opt-out

3  requests, specifically, to be clear, opt-out

4  requests being returned as undeliverable to the

5  sender?

6        MR. GROSS:  Object to the form.

7        THE WITNESS:  I'm not sure.

8  BY MR. WADE-SCOTT:

9  Q.  You're not sure if you are aware of it, or

10  you're not aware of it?

11        MR. GROSS:  Object to the form.

12        THE WITNESS:  I don't recall.

13  BY MR. WADE-SCOTT:

14  Q.  Are you aware of Mr. Browder making a

15  statement on Twitter about arbitration being

16  optional?

17        MR. GROSS:  Object to the form.

18        THE WITNESS:  I don't recall.

19  BY MR. WADE-SCOTT:

20  Q.  Generally speaking, does Mr. Browder act

21  as the public spokesperson for the company?

22        MR. GROSS:  Object to the form.

23        THE WITNESS:  I don't know.

24  BY MR. WADE-SCOTT:

25  Q.  Are there other spokespeople for DoNotPay

- - -

1 that you're aware of?

2         MR. GROSS:  Object to the form.

3         THE WITNESS:  I don't know.

4 BY MR. WADE-SCOTT:

5     Q.  Are you aware of any occasion on which

6 anyone other than Mr. Browder has made a public

7 statement for DoNotPay?

8         MR. GROSS:  Object to the form.

9         THE WITNESS:  I don't know.

10 BY MR. WADE-SCOTT:

11     Q.  Are you aware that Mr. Browder has any

12 role with relation to speaking publicly for the

13 company?

14         MR. GROSS:  Object to the form.

15         THE WITNESS:  I don't have an opinion on

16     that.

17 BY MR. WADE-SCOTT:

18     Q.  I'm not asking for an opinion, exactly.

19 I'm asking whether you are aware that Mr. Browder

20 has -- let's phrase it this way -- ever spoken

21 publicly for DoNotPay.

22         MR. GROSS:  Object to the form.

23         THE WITNESS:  Could you rephrase the

24     question, please?

25 BY MR. WADE-SCOTT:

           - - -

1     Q.   Sure.  Are you aware that Mr. Browder has

2  spoken publicly on behalf of DoNotPay?

3         MR. GROSS:  Object to the form.

4         THE WITNESS:  He may have, yes.

5  BY MR. WADE-SCOTT:

6     Q.   Does Mr. Browder act as the public

7  spokesperson for the company?

8         MR. GROSS:  Object to the form.

9         THE WITNESS:  I don't know.

10  BY MR. WADE-SCOTT:

11     Q.   I want to look at just one more thing for

12  a second, and then we can -- if you go back to the

13  interrogatory responses and go to Exhibit D, the

14  event logs...

15     A.   Okay, I'm in Exhibit D.

16     Q.   How did you determine that the accounts

17  referenced in Exhibit D were associated with the

18  plaintiff?

19     A.   Would you mind asking me more specific

20  questions?  There were a myriad processes that took

21  place.

22     Q.   Did you search by -- well, let me just go

23  back.  What search processes did you use to

24  determine that these accounts were associated with

25  the plaintiff?

- - -

1      A.   So I searched for the word "Faridian" in

2  SanDisk, which is a customer support CRM third-party

3  tool that we use to handle customer support

4  requests.

5      Q.   And then, of these accounts, Accounts 1

6  through 4, did you look to see if these accounts had

7  access to the terms and conditions page at any

8  point?

9         MR. GROSS:  Object to the form.

10         THE WITNESS:  Could you rephrase the

11     question, please?

12  BY MR. WADE-SCOTT:

13      Q.   Sure.  Of the accounts that you said are

14  associated with plaintiff, did you check to see

15  whether those accounts had ever viewed the terms and

16  conditions page?

17      A.   I don't recall.

18      Q.   You may have, but you don't remember?

19         MR. GROSS:  Object to the form.

20         THE WITNESS:  I don't recall.

21  BY MR. WADE-SCOTT:

22      Q.   Sitting here today, do you have any reason

23  to think that plaintiff actually viewed the terms

24  and conditions page?

25         MR. GROSS:  Object to the form.

                              - - -

1           THE WITNESS:  I don't know.

2           MR. WADE-SCOTT:  What was the form

3      objection there, Paul?

4           MR. GROSS:  Calls for speculation.

5  BY MR. WADE-SCOTT:

6      Q.   Based on your personal knowledge, do you

7  have any reason to think that plaintiff accessed the

8  terms and conditions page?

9      A.   I don't know.

10      Q.   You don't know if you know, or you don't

11  know if plaintiff accessed the terms and conditions

12  page?

13      A.   I don't know if the plaintiff accessed the

14  terms of service page.

15           MR. WADE-SCOTT:  All right.  With that,

16      I'll pass the witness.

17           MR. GROSS:  Thank you.

18                         - - -

19  BY MR. GROSS:

20      Q.   Mr. Kim, just a very few questions for

21  you.  I'd ask that you look at what plaintiff's

22  counsel marked as Exhibit 3, and let me know when

23  you have that up.  As a reminder, that was the

24  [audio distortion] mobile screenshot.  Yes, exactly.

25      A.   Okay, I have this up.

- - -

1     Q.   Mr. Kim, before today, have you ever seen

2 this document before?

3     A.   I have not.

4     Q.   Do you know who created this?

5     A.   I have no idea.

6     Q.   Do you know when this was created?

7     A.   I have no idea.

8     Q.   Have you ever seen the DoNotPay home page

9 displayed in this specific format?

10     A.   I don't believe so.

11     Q.   Do you know one way or the other whether

12 any device's default settings would result in the

13 DoNotPay home page being displayed in this format?

14     A.   I'm not sure.

15     Q.   Have you ever seen the DoNotPay's home

16 page presented in a way where the terms of service

17 link is cut off?

18     A.   I don't think so.

19     MR. GROSS:  No more questions from me.

20     MR. WADE-SCOTT:  I think we can end the

21   dep.

22     THE TECHNICIAN:  Yes, sir.  Any video

23   orders while we're on the record?  Mr. Gross?

24     MR. GROSS:  We will take a video, but no

25   rush.

- - -

1        THE TECHNICIAN:  Yes, sir.  Anybody else?

2        MR. WADE-SCOTT:  I'll follow up.  Thanks,

3   Ish.

4        THE TECHNICIAN:  Yes, sir.  And, Madam

5   Court Reporter, do you have anything you need

6   to ask?

7        MR. GROSS:  You're muted.  Grace, you're

8   muted.

9        THE COURT REPORTER:  I'm sorry.  Do you

10  both need copies of the transcript?

11       MR. GROSS:  We would like a rush rough

12  copy, and then final whenever it's available.

13       THE COURT REPORTER:  Okay.

14       MR. RICHLIN:  You know, Ish, let's wait on

15  the video order.  We may not need that after

16  all, so let's -- we'll hold off on the video.

17  Purse strings.

18       THE TECHNICIAN:  If nobody has anything

19  else, I'll read us off the record.  This

20  concludes Volume I of the deposition of Andrew

21  Kim in the matter of Faridian versus DoNotPay,

22  Inc.  We are now off the record.  The time is

23  12:00 o'clock p.m. Central Time.

24                      - - -

25       (Witness excused.)

- - -
1                       - - -

2    (Deposition concluded at 12:00 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- - -

C E R T I F I C A T E

- - -

1

2

3

4          I do hereby certify that I am a Notary
Public in good standing, that the aforesaid
testimony was taken before me, pursuant to notice,
5    at the time and place indicated; that said deponent
was by me duly sworn to tell the truth, the whole
6    truth, and nothing but the truth; that the testimony
of said deponent was correctly recorded in machine
7    shorthand by me and thereafter transcribed under my
supervision with computer-aided transcription; that
8    the deposition is a true and correct record of the
testimony given by the witness; and that I am
9    neither of counsel nor kin to any party in said
action, nor interested in the outcome thereof.

10

11          WITNESS my hand and official seal this
16th day of June, 2023.

12

13

14

15          *Grace M. Baldino*
Notary Public

16

17

18

19

20

21

22

23

24

25

```
               - - -
          E R R A T A

               - - -

 PAGE        LINE              CHANGE
```

1
2
3
4 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

5 Reason for

6 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

7 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

8 Reason for

9 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

10 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

11 Reason for

12 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

13 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

14 Reason for

15 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

16 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

17 Reason for

18 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

19 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

20 Reason for

21 Change: _ _ _     _ _ _ _ _ _ _ _ _ _ _

22 _ _ _     _ _ _     _ _ _ _ _ _ _ _ _ _ _

23 Reason for

24 Change _ _ _     _ _ _ _ _ _ _ _ _ _ _

25

- - -

1          ACKNOWLEDGMENT OF DEPONENT

2                          - - -

3          I, _____, do hereby certify that

4    I have read the foregoing pages 1 to ____ and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded,

7    except for the corrections or changes in form or

8    substance, if any, noted on the attached Errata

9    Sheet.

10   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11   DATE                                SIGNATURE

12

13                 Subscribed and sworn to before

14   me this _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ , 20__.

15

16                 My commission expires:

17                 _ _ _ _ _ _ _ _ _ _ _

18

19

20                 _ _ _ _ _ _ _ _ _ _ _

21                 Notary Public

22

23

24

25

**Exhibits**

**Exhibit 1** 3:14 12:22
13:5,8,9,13,25
**Exhibit 2** 3:15 14:6
**Exhibit 3** 3:17 55:25
56:3 57:11,17 58:17,24
74:22
**Exhibit 4** 3:16 49:23
55:8,10,11,14

---

**1**

**1** 12:22 13:5,8,9,13,25
32:17 33:2 34:12 35:12
36:16 73:5
**10:03** 5:9
**10:56** 42:17,21
**11** 34:22
**11:01** 42:21,23
**11:05** 44:4
**11:37** 66:3,7
**11:48** 66:7,9
**12:00** 76:23 77:2
**14** 44:14
**164** 45:13,16 48:3
**17th** 44:3,4
**18th** 30:23

---

**2**

**2** 14:6 33:24 39:17
45:17
**20** 44:17 45:8 65:22
**2021** 44:3,4,5 50:7,14,
17 51:6,15
**2022** 44:5 50:18
**2023** 5:10
**23-CV-01692-JD** 5:15
**28th** 44:5
**29** 6:23

**2nd** 44:4

---

**3**

**3** 34:24 55:25 56:3
57:11,17 58:17,24
74:22
**39** 32:7
**3:44** 44:6

---

**4**

**4** 49:23 55:8,11,14 73:6
**4th** 30:23

---

**5**

**5th** 5:10

---

**6**

**644422** 34:23
**6th** 50:7

---

**9**

**90** 65:18 66:13 67:5
**9:35** 44:3
**9:43** 44:5

---

**A**

**a.m.** 5:9 42:17,21,23
44:3,4,6 66:3,7,9
**ability** 8:24
**Absolutely** 43:4
**accept** 46:25 47:14,23
48:15,24 49:14 51:12,
20 53:20 54:20 55:6
67:25 69:23
**acceptable** 43:19
**accepted** 53:23 54:3,7
**accepting** 51:7,15
67:20 68:14,19 70:2

**access** 60:2 73:7
**accessed** 74:7,11,13
**accessible** 59:4
**account** 23:14,16 24:1,
9 29:8,23 30:3,6,9,11,
13,14,17,20,24 32:2,17
33:2,24 34:12,13,24
35:12 36:16,17 43:9,15
50:18 56:11
**accounts** 18:10 19:22
29:15,23 30:1 33:12
34:1 43:13,25 56:6,20
72:16,24 73:5,6,13,15
**accurate** 18:2,13
**acknowledge** 6:15
**act** 70:20 72:6
**active** 37:5
**actual** 39:16
**added** 44:7
**addition** 8:7
**address** 45:13,15,16,
18,23 46:5,25 47:6,9,
16,19 48:11,19 49:5,7,
17 51:3,7,16,20 52:1,7,
10,13,17,22 53:1,6,21
54:3,8,18,25 67:19
**administer** 6:18
**affect** 31:1,2,5 60:25
61:3
**affected** 31:8
**affidavit** 10:2,4
**agree** 6:21 57:11 58:9
**agreed** 5:1 66:12,17,18
**agreed-upon** 53:16
**agreeing** 22:5
**ahead** 8:13 12:8,13
14:6,21 16:19 37:11
49:24
**Allie** 6:10
**Andrew** 5:11 7:5 13:15,
23 43:16 44:2 76:20
**Android** 34:17,22
35:14,16,24 36:1,4 64:7

**answers** 8:9
**anticipated** 65:20
**anymore** 47:11
**app** 21:22 64:17,24
**appearances** 6:4
**appeared** 19:10,12,14,
16,21 55:21 57:17,19
**appearing** 6:15
**appears** 20:2 27:1,6
34:17 35:4,24 56:4
57:22 58:17
**applicable** 48:10,14,23
49:12 50:17 51:10,22
54:21 55:3 67:24 68:21
69:20
**application** 63:25
64:3,5,9,14 65:10
**approximately** 10:12
44:3,4,6
**April** 28:2,4
**arbitrate** 66:17
**arbitration** 44:12
46:15,19 47:23 48:13,
15,22,24 49:13 50:24
51:10,12,18,23 53:15
54:20,23 55:4,6 67:18,
21,22,25 68:19,20
69:21,23 70:2,15
**architectural** 10:19
**Archive** 16:3,16,22
17:4
**article** 21:13
**assume** 8:2 40:18
**attached** 44:23,24
45:3,4
**attorney** 8:13
**attorneys** 6:14 9:15,18
43:2
**audible** 8:8
**audio** 74:24
**avoid** 8:10
**aware** 15:22 23:21
24:8,12 34:10 36:14

47:18 53:10,22 54:23
60:20 67:19 68:10,12,
13 70:1,9,10,14 71:1,5,
11,19 72:1

**B**

**back** 16:8 17:14 34:2
42:24 44:7 55:25 57:16
66:10,23 72:12,23

**Baldino** 5:19

**base** 16:7,14 17:12,14,
16

**based** 23:6 35:7,8
56:12 74:6

**basic** 67:9

**begin** 5:10

**behalf** 5:17,19 40:18
72:2

**bigger** 23:3

**bit** 48:17 49:23 65:20

**blog** 21:14

**bounds** 35:10

**break** 42:14 43:3 65:15

**broad** 61:9

**broke** 54:11

**Browder** 9:20 53:10
70:14,20 71:6,11,19
72:1,6

**browser** 20:3,10,11,14
26:15 27:1,3 33:14
57:6,23 58:1

**bunch** 36:1

**business** 39:21 40:10

**button** 58:19 59:4

**C**

**California** 5:14 67:19

**called** 37:14

**Calls** 74:4

**carries** 7:18

**case** 5:12,14

**category** 26:21 36:4

**cease** 51:25 52:6,9

**Central** 5:9 42:17,24
66:3,10 76:23

**CEO** 53:10

**certification** 5:3

**cetera** 33:16

**chance** 14:10

**change** 14:23 59:24
60:3

**changed** 15:22 47:3

**charge** 12:4 68:23 69:4

**chat** 12:22 13:14 14:10
55:22

**check** 22:24 73:14

**circle** 16:8

**Civil** 6:23

**claimed** 40:8 53:11

**clarify** 8:2 13:10

**clarity** 44:20

**clean** 55:10

**clear** 67:6 70:3

**click** 58:18

**clicked** 38:22 39:11
41:23 42:5

**clicks** 23:10,13

**cocktails** 8:23

**code** 16:7,14 17:12,14,
16 30:22 31:2,11,15,21,
23 32:1,11 34:1,5

**colleagues** 6:10

**collect** 37:14,25

**collecting** 46:4

**collects** 38:5,12

**communications** 9:2

**company** 9:18 10:11
11:15 40:18,19 53:11
63:5 70:21 71:13 72:7

**computer** 26:14

**concluded** 77:2

**concludes** 76:20

**conclusion** 8:16

**conditions** 22:6 23:17
24:3 38:23 39:9 40:3,
15,22 41:3,17,23 42:5,
7,10 73:7,16,24 74:8,11

**conference** 5:16

**confident** 23:7

**confirm** 9:1,5

**contained** 37:8

**content** 21:4,14 29:3

**copies** 13:17 76:10

**copy** 76:12

**correct** 14:18,25 15:18
24:25 28:24

**correctly** 16:4

**counsel** 5:2,20,23 6:3,
8,12,20 9:8,9,13 13:23
66:15,24 74:22

**counsel's** 67:1

**country=us** 32:19

**court** 5:13,18 6:14 7:22
8:6 54:13 56:14 76:5,9,
13

**courtroom** 7:17

**create** 20:19 27:4,6,10
28:15,21 29:15 32:3

**created** 11:5 12:11
18:10 23:14 27:13,16,
17,25 28:9 29:23 30:4
33:11 34:13 35:12
36:17 43:9,13,15,25
50:18 61:8 62:18 63:6
75:4,6

**creates** 32:2

**creating** 19:22 28:4

**creation** 11:2 23:17
24:1,10 29:8 62:23

**CRM** 73:2

**cue** 8:10

**customer** 73:2,3

**cut** 75:17

**cycle** 10:16

**D**

**data** 37:14,19 38:21
39:10 41:22 42:1

**dates** 15:21 43:12,14,
25

**decide** 62:14

**decided** 66:19

**declaration** 13:25
43:18 44:2,15,24 45:3

**default** 75:12

**defendant** 6:8 44:3
67:12

**degree** 33:13

**deleted** 55:7

**dep** 75:21

**depend** 61:6,7

**deponent** 67:7

**deposition** 5:10,15
6:15,16,18,24 9:4,7,15,
18,21,24 53:15,17
66:12,13,14,19 67:3,12
76:20 77:2

**design** 10:21 62:10
64:13 65:9

**desktop** 20:11,13
26:20 27:1 33:18 35:4
59:17 60:6,14

**details** 46:13 49:11
68:18

**determine** 72:16,24

**development** 10:16

**device** 19:24 20:5 26:7,
14,19,20,24 33:7,11,14
34:3,5,12,14,18 35:1,5,
10,24 37:1 59:24 60:2

**device's** 75:12

**devices** 36:2 59:17,21

**disagreement** 67:11

**discuss** 43:1

**display** 61:20

**displayed** 19:4,7 20:24
21:10 22:14 23:18,21,
23,25 24:6,9,14,23
25:5,21 29:1 39:8 59:24
60:1 61:1,4 75:9,13

**distinction** 17:4

**distortion** 74:24

**District** 5:13,14

**DNP** 39:21 40:10 54:3

**document** 12:25 13:4,
13 14:9,12 15:3 43:5,
23,24 49:22 75:2

**documents** 9:23 10:1,
2,3 13:10 45:2

**Donotpay** 5:12 6:9
10:6,8 11:6,10,19,24
12:12 15:8 20:23 21:22
29:15,21 30:19 31:2,22
34:4 36:10,25 37:7,8,
14,25 38:5,11,12,21
39:10,20 40:1,2,13
41:4,7,12,15 42:6,9
45:20 46:3,18,24 47:8,
11,13 48:10 49:6,16
50:4,16 51:6,15,25
52:6,10,21,25 53:5,11,
20 54:7,17 56:6,20 57:5
58:16 59:14,16,20 60:5
61:21,25 62:6,10 63:3,
5,25 64:8,16,17 70:25
71:7,21 72:2 75:8,13
76:21

**Donotpay's** 11:3 17:3
22:5 24:20 25:17 26:2
42:4 56:12 57:18 75:15

**Donotpay.com** 15:17,
20 21:8 56:4,18 57:12,
23

**Donotpay.com's**
19:11

**Donotpay.com.** 26:5

**Donotpay.com/
connect** 25:1,6

**Donotpay.com/login**
24:24 25:20

**Donotpay.com/login.**
19:14

**Donotpay.com/login?
phone=5307865028".**
32:18

**doubling** 55:25

**drop** 12:22

**dropped** 13:14 14:9

**drugs** 8:22

**duly** 7:6

---

**E**

**earlier** 56:10 57:17
63:15,19

**early** 8:23

**Edelson** 6:3

**edited** 11:16 12:11

**effect** 48:2,13 51:11

**electronically** 9:3

**Eli** 6:2,10 7:12 28:6
53:13 65:16

**email** 22:7 58:11,18
59:3,9

**Emily** 55:11

**employee** 46:3 52:21

**employees** 12:1,4
38:10 46:18 52:16 63:3,
4

**encounter** 30:4

**encountered** 15:7
29:8 30:10,20 34:4

**encounters** 36:24

**end** 75:20

**endeavor** 66:13

**ending** 53:11

**engineer** 17:14,18,20
27:17

**engineers** 10:18

**enter** 58:18

**entered** 58:10

**equipment** 38:1

**event** 33:10 72:14

**evidently** 36:17

**exact** 11:20 15:21
46:13

**EXAMINATION** 7:9

**examined** 7:6

**examples** 36:2

**Excuse** 25:10 56:24
57:20

**excused** 76:25

**exhaustive** 25:20

**exhibit** 12:22 13:5,8,9,
13,25 14:5,6 15:3,6,14,
15 16:1,9 17:2,3 18:1,2,
8,23 19:4,10,11,13,15,
19 20:24 21:4,21 24:17
25:5,7,14,22 26:1,18,25
27:7,24 29:1,4,7,10,21
30:7,15,18 32:5,9,10
43:6 44:8 49:23 55:8,
10,14,25 56:3 57:11,17
58:17,24 62:17,18
72:13,15,17 74:22

**exhibits** 13:11 39:9
62:24

**exists** 16:21

**explain** 67:9

**expressly** 66:18

**extent** 53:24 67:5

---

**F**

**fact** 41:7 50:16 56:10

**fair** 8:3 15:9 18:11 26:2,
21 27:14 31:21 37:2
45:14 51:4

**fairly** 17:1 28:10 67:8

**fall** 64:24

**familiar** 50:7,21

**Faridian** 5:11 15:25
17:15 18:17 32:14,25
73:1 76:21

**Federal** 6:23

**Fellows** 6:10

**field** 34:22 37:14 59:3

**fields** 37:2

**figure** 53:19,24

**filing** 5:3

**final** 76:12

**finish** 8:14

**firm** 6:8

**five-minute** 42:14
65:15

**flip** 32:5

**flow** 64:9

**focused** 53:16

**follow** 76:2

**font** 21:17,25 22:9,14
23:5

**force** 43:9 44:9

**form** 5:4 10:23 12:13,18
14:19 15:10 16:17,23
17:7 18:4,25 19:5 20:1,
3,7,16,20,25 21:6,12,18
22:1,10,16,22 23:4,12,
19 24:2,4,11 25:2,9,23
26:3,8,10 27:8,21 28:6,
17,23 29:11,16 30:5
31:4,10,17,24 32:15
33:19 34:8,16 35:3,13,
18 36:6,12,20 37:3,10,
16,21 38:2,7,13,18,24
39:2,12 40:4,16,23
41:9,18,25 42:11 45:24
46:21 47:1,12,20 48:5,
20 49:9,18 50:9,19 51:8
52:2,12,18 53:2,7 55:1
56:25 57:8,14,20 58:2,
13,20,25 59:6,11 60:8,
15,22 61:5,14,22 62:2,
7,11,19,25 63:7,16,22
64:1,10,18 65:1,6 68:3,
7,16,25 69:9,15,19
70:6,11,17,22 71:2,8,
14,22 72:3,8 73:9,19,25
74:2

**formal** 7:17

**formalities** 7:14,18

**format** 75:9,13

**forthcoming** 67:7

**fourth** 30:16,17

**Francisco** 45:14,19
52:7 53:12

**front** 14:6 50:3,5

**full** 17:22

**full-time** 11:25 12:3
38:10 63:4

___

**G**

**Galaxy** 36:3

**gave** 26:23

**general** 51:14

**generally** 8:14 11:16
13:7 36:23 42:9 70:20

**give** 10:13 13:10

**giving** 8:8

**good** 5:8 8:8 42:15

**Google** 36:3

**Grace** 5:18 76:7

**Gross** 6:7 10:23 12:6,8,
13,18 13:15,22 14:19
15:10 16:17,23 17:7
18:4,25 19:5 20:1,7,16,
20,25 21:6,12,18 22:1,
10,16,22 23:4,12,19
24:2,4,11 25:2,9,23
26:3,8,12 27:8,21 28:6,
17,23 29:11,16 30:5
31:4,10,17,24 32:15
33:19 34:8,16 35:3,13,
18 36:6,12,20 37:3,10,
16,21 38:2,7,13,18,24
39:3,12 40:4,16,23
41:9,18,25 42:11,15
43:16 44:14,19,21
45:24 46:21 47:1,12,20
48:5,20 49:9,18 50:9,19
51:8 52:2,12,18 53:2,7,
13 54:2,6,10 55:1,13,20
56:15,16,24 57:8,14,20
58:2,13,20,25 59:6,11
60:8,15,22 61:5,14,22
62:2,7,11,19,25 63:7,
16,22 64:1,10,18 65:1,
6,11,16,24 66:11 67:15
68:3,7,16,25 69:9,15,19

**group** 38:16

**guess** 61:7

___

**H**

**handle** 73:3

**head** 8:10 36:2

**headers** 22:15 23:1

**heard** 37:19

**Hearing** 7:2

**height** 33:4 35:9 37:2

**highlight** 55:9,19

**hit** 59:9

**hold** 39:1 76:16

**home** 15:16,17,22,24
19:11,20 20:24 21:22
75:8,13,15

**HQ** 47:13

**https** 32:17

**https://donotpay.
com/.** 32:23

**hyperlink** 36:18 56:21
57:6

**hyperlinks** 38:22 39:8

___

**I**

**idea** 41:2 75:5,7

**identify** 5:20,22 34:5

**identities** 38:1

**identity** 37:15

**ignore** 23:1

**image** 25:21 26:1 29:1

**images** 23:6 64:8

**imagine** 65:22

**IMEIS** 38:1,6,12

**impacted** 31:16,19

**impair** 8:23

**impaired** 8:19

**IMSI** 37:15,20

**IMSIS** 38:6,12

**include** 10:22

**including** 41:16

**indiscernible** 9:12

**information** 30:12
33:15 36:25 38:17

**initiatives** 10:17,18

**input** 11:2

**instructed** 8:17

**international** 37:15,25

**Internet** 16:3,16,22
17:4

**interrogatories** 14:13,
15,17,25 17:6 39:15
40:9 44:17 45:4

**interrogatory** 15:3,5
16:9 17:2 29:2 32:6
39:16,17 43:5,17 44:8,
23 45:8 72:13

**interrupt** 43:16

**interval** 30:25

**involved** 62:23

**ios** 64:7

**IP** 33:16

**lsh** 5:17 76:3,14

**issue** 15:8 17:5,9 65:25

___

**J**

**Javascript** 33:9

**job** 8:8 10:14,15

**joined** 6:9

**Joshua** 9:20

**July** 44:4 50:6,7,8,14,
17 51:6,15

**June** 5:10 30:23 44:4

**jurisdiction** 53:14 54:1

___

**K**

**Kim** 5:11 7:5,12 14:21
26:18 28:15 43:1,22
44:2 53:21 65:21 66:15,
21,22 67:6,17 74:20
75:1 76:21

**Kim's** 28:8

**kind** 7:16 20:5 26:19,
20,24 34:15 35:16
67:11

**knowledge** 19:17
30:21 40:25 41:10
44:11 45:21 52:23
54:18 62:1 74:6

___

**L**

**labeled** 13:11

**large** 36:25

**law** 6:8

**lawyer** 21:17,23

**left** 55:9

**legal** 5:16 17:22

**life** 10:16

**link** 23:23,25 24:6,9,14
58:5,7,12,19,23 59:1
61:13,20 62:14 75:17

**list** 25:20

**lists** 39:23 40:11

**litigation** 28:3

**live** 41:11,14,20

**loaded** 32:20 57:23,25

**locally** 17:16 18:22

**located** 47:8,11

**location** 33:15

**log** 32:3 33:2 37:4

**logged** 33:17 35:1

**logging** 18:10

**login** 10:22 18:2,9
23:11,14 57:5 59:15

**logs** 30:23 32:10,13 33:10,21,23 34:21 36:7, 10 72:14

**long** 10:10 33:20 41:10 44:15

**longer** 55:13 65:20

**looked** 15:20,24 29:22 59:17,21 64:9

**lot** 11:20,21

---

## M

**Machine** 16:3,5 18:21, 24 19:2

**Madam** 76:4

**made** 11:9 71:6

**mail** 45:20 46:25 47:14, 18 48:3 49:17 51:7,15, 20 53:20,23 54:3,7,18

**maintain** 59:14,16,20 64:8

**make** 56:9

**makes** 67:6

**making** 70:14

**manner** 7:1 9:3

**March** 44:5

**marked** 12:21 13:16 49:22 74:22

**marking** 13:18

**matter** 5:11 53:14 54:1 67:2 76:21

**meaning** 8:6 26:23 59:17

**medication** 8:22

**meet** 9:11,14

**mentioned** 10:2,4 27:18 32:11 46:12

**messages** 22:6

**met** 9:8

**mind** 72:19

**minus** 55:18

**minute** 19:20 23:2

**minutes** 65:18,23 66:14,20 67:5

**mobile** 34:14 35:10 37:15,25 56:7,11,18 58:1,17 59:18 60:7,13 63:25 64:2,5,9,14,17,24 65:10 74:24

**model** 35:11,21,23 36:5

**models** 36:1,4

**moment** 24:12 28:11 36:14

**morning** 5:8 8:23

**moving** 55:12

**muted** 76:7,8

**myriad** 72:20

---

## N

**N-G-U-Y-E-N** 17:25

**Nguyen** 17:20 27:18 28:16

**Nguyen's** 17:21

**non-contractor** 12:1,4

**Northern** 5:13

**nos** 8:9

**notable** 17:1 28:10

**notary** 6:22

**notice** 45:13 49:5

**notices** 45:22 46:4

**number** 5:14 11:20 22:7 59:3 67:9 68:2

**numerous** 66:15

---

## O

**oath** 6:19 7:19,21

**object** 10:23 12:6,13,18 13:23 14:2,19 15:10 16:17,23 17:7 18:4,25 19:5 20:1,7,16,20,25 21:6,12,18 22:1,10,16, 22 23:4,12,19 24:2,4,11 25:2,9,23 26:3,8 27:8, 21 28:6,17,23 29:11,16

30:5 31:4,10,17,24 32:15 33:8,19 34:8,16 35:3,13,18 36:6,12,20 37:3,10,16,21 38:2,7, 13,18,24 39:12 40:4,16, 23 41:9,18,25 42:11 45:24 46:21 47:1,12,20 48:5,20 49:9,18 50:9,19 51:8 52:2,12,18 53:2,7 55:1 56:15,24 57:8,14, 20 58:2,13,20,25 59:6, 11 60:8,15,22 61:5,14, 22 62:2,7,11,19,25 63:7,16,22 64:1,10,18 65:1,6 68:3,7,16,25 69:9,15,19 70:6,11,17, 22 71:2,8,14,22 72:3,8 73:9,19,25

**objection** 6:25 8:14,16 26:11 39:2 65:11 74:3

**objections** 5:4 67:2

**objects** 8:13

**obvious** 67:8

**occasion** 71:5

**occupying** 52:10,13

**office** 45:18 53:25

**open** 12:23 14:6,7,8 49:24,25 56:1,2 57:4

**opened** 12:24

**opens** 56:18

**operating** 33:13 34:21

**operational** 53:25

**operations** 51:25 52:6, 9 53:12 54:10

**opinion** 60:9,18 71:15, 18

**opt** 45:12

**opt-out** 45:9,10,22 46:4,7,12,14,15,20 47:23 48:3,11,15,18,25 49:6,14 51:3,12 54:20, 23 55:6 67:25 68:19 69:24 70:2,3

**opt-outs** 67:21 68:15

**opting** 67:18

**optional** 70:16

**order** 49:24 76:15

**orders** 75:23

**ordinary** 39:21 40:9

**oversee** 10:16

---

## P

**p.m.** 44:5 76:23 77:2

**pages** 39:20 62:24 63:6

**paradigms** 10:19

**parameters** 39:23,24 40:11,12

**part** 13:20 22:14 23:16 24:1,20 26:2 37:8 48:2

**Partially** 62:12

**parties** 5:2 6:20 66:12, 18

**parts** 61:1,4

**party** 6:25

**pass** 66:23 74:16

**past** 15:23 41:24 65:2, 5,12

**Paul** 6:7 14:3 26:10 39:2 74:3

**pay** 52:25 53:5

**PC** 6:3

**PDF** 44:14,17

**Penkowski's** 55:11

**people** 5:23 11:19,24

**Perfect** 6:6,11

**period** 15:8 31:9 48:9 56:5

**permit** 66:22

**personal** 74:6

**perspective** 67:1

**pertinent** 33:15

**phone** 20:12 22:6 26:20 28:22 33:18 35:11,17 36:17 56:7,11, 19 58:17 59:3,18 60:7, 13,25 61:3,11,19

**phones** 36:4 60:20

**phrase** 71:20

**physically** 6:16

**Pixel** 36:3

**place** 5:16 18:19 24:8
43:10 46:7,14 47:22
48:15,24 49:12 51:12,
19,22 54:20,22 55:5
67:20,24 68:11,19 69:8,
11,14,23 72:21

**places** 19:13

**plaintiff** 6:3 18:10
19:21 29:14,22,24,25
30:3 31:1 33:11 34:13
35:1,12,17,23 36:5,16,
18,24 38:22 39:10 40:3,
14,22 41:3,5,16 43:9,
13,25 50:18 56:6,10,19
66:17 72:18,25 73:14,
23 74:7,11,13

**plaintiff's** 66:15,24,25
74:21

**platform** 64:5

**point** 31:22 47:19,25
52:1,8,11 66:21 70:1
73:8

**portion** 31:12

**position** 28:8 46:24

**post** 21:14

**precise** 68:17

**prepare** 9:6,15,23

**prerogative** 67:13

**present** 6:16

**presented** 75:16

**president** 10:9 64:25

**previous** 16:6 32:24
49:19

**previously** 27:18
32:12

**problems** 70:1

**procedure** 6:23 46:7,9,
11,14,16 48:2,15,24
49:3,12 51:4 53:22
54:20 55:5 67:20,24

68:11,14,18,24 69:4,8,
11,13,23 70:2

**procedures** 46:20

**proceed** 7:3

**proceeding** 7:17 9:4
42:21 66:7

**process** 23:17 24:1,10
29:9 51:11,19,22

**processes** 72:20,23

**produced** 32:11 33:25
34:6

**producing** 30:22

**product** 10:9,16 64:25

**products** 10:20

**prompt** 28:11

**provided** 14:24 22:7
29:21

**provision** 44:13 48:13,
22 49:4,13 50:23 51:11,
18,23 54:22 55:4 67:18,
23 68:20 69:21

**public** 70:21 71:6 72:6

**publicly** 71:12,21 72:2

**pull** 18:23 60:5

**pulled** 19:1 58:10,16

**purposes** 34:2

**Purse** 76:17

**pursuant** 6:22

**purview** 64:25

**put** 59:9

## Q

**question** 5:5 8:2,15
11:13 14:22 15:12 18:6
19:8 23:8 25:3,12 26:13
28:13 29:18 35:25 40:6,
12 46:1 47:4 48:7 49:4
51:14 52:4,14 54:5
59:19 61:2,9 64:22 69:2
71:24 73:11

**question's** 48:17

**questioning** 66:21

67:10

**questions** 7:13,24 8:1,
9,20,24 53:13 66:16,23
72:20 74:20 75:19

**quickly** 7:14,15

## R

**read** 13:1 42:10,16
44:10 66:2 76:19

**reason** 23:8 52:22
73:22 74:7

**recall** 11:11 12:19 17:8
19:1 20:8,17,21 26:9
27:22 37:23 41:5 50:15
55:2 62:3,16 63:17
64:15 65:7,13 67:3,8
69:16 70:12,18 73:17,
20

**receive** 13:21 45:20
46:7,12,14 48:11,18
49:6,17

**receiving** 9:2 54:17

**recess** 42:20 66:6

**recognize** 12:25 13:3
50:2 56:3

**recollection** 28:12

**recommend** 6:1

**record** 5:9 8:11 17:24
42:13,18,24 66:1,4,10
67:6 75:23 76:19,22

**recorded** 8:5,7

**records** 17:3 25:18
56:12 59:14,16,20

**recreated** 16:13 17:11
18:22 25:17

**recreating** 16:6

**redeployed** 17:16

**refer** 32:21,23 33:6
43:17,23 44:1

**referenced** 72:17

**referring** 9:12 13:6
36:16 43:24 44:1,18

**relation** 71:12

**relevance** 28:7 39:4,6

**relevant** 15:24 16:14
17:15 18:17 30:22
31:13 68:11

**remember** 16:4,20
17:4 19:18 22:2,11
28:9,18 62:20 63:1,8,23
65:21 73:18

**reminder** 74:23

**remotely** 6:18,19 7:6

**rent** 52:25

**reopen** 67:14

**repeat** 14:22 15:11
29:18 40:5 59:19 61:2
69:1

**repeatedly** 53:21

**rephrase** 18:5 42:6
48:6 52:3 71:23 73:10

**replaced** 13:16

**replacement** 55:14,16

**reporter** 5:18 6:12,14
8:6 54:13 56:14 76:5,9,
13

**reporting** 6:17 7:1

**represent** 5:21 55:18

**representation** 57:12

**representations** 18:2,
14

**represented** 58:24

**request** 48:18

**requests** 46:8,12,15
47:23 48:3,11,16,25
49:7,14 51:12 54:21,24
55:6 67:25 68:20 69:24
70:3,4 73:4

**reserve** 67:13

**reserved** 5:5

**resolution** 61:19

**respect** 49:2 52:11
65:10 69:5

**respective** 5:2

**responded** 17:5 39:21
53:21

response 14:12,14
39:17,19 40:8

responses 14:24 15:5
16:10 17:2 29:2 32:6
39:16 43:18 44:8,24
45:8 72:13

responsibilities
10:14,15

responsible 46:4

restart 50:2 59:15 63:4

Resto 5:17

result 66:19 75:12

results 34:6,25

retrieve 16:12

retrieved 16:2,5

returned 54:24 70:4

reviewed 14:14

Richlin 6:10 76:14

robot 21:16,23

role 64:13 71:12

room 6:17

rough 76:11

roughly 66:13

Rule 6:23

run 7:13

running 26:11 41:11,
15,20

rush 75:25 76:11

_____

S

Safe 22:13

Samsung 36:3

San 45:14,19 52:7
53:12

Sandisk 73:2

save 55:17

screen 15:19 16:12,21
19:11 29:7,17 30:9,14,
17,19 32:14,24 33:7
36:25 37:1,9 56:22
57:5,7 58:11 59:15,16,

21,23 60:1,3,7,12,13,
21,25 61:3,8,11,20

screens 15:6,15 17:11
18:3,9,16,19 29:20

screenshot 16:1 17:17
19:20,24 20:6,14,19
21:11,21 24:19 25:14
26:1,4,7,19 27:4,6,12,
13,20,24 28:9,15,21
58:6,7,24 74:24

screenshots 28:4

script 41:11,14,19

scroll 15:2 16:9 21:3,8
32:6 39:15 43:6 44:12
50:1

sealing 5:3

search 72:22,23

searched 73:1

section 45:7

send 22:6 45:13 49:4

sender 70:5

sense 65:16

series 7:24

service 11:3,6,10,17
12:5,12 41:6 43:8 47:3,
6 48:1,10,14,23 49:14
50:3,5,8,13,21 51:19,24
54:22 55:5 56:7,21
62:15 67:23 68:21
69:22 74:14 75:16

setting 61:18

settings 75:12

shakes 8:10

show 32:13 36:11
49:22

showing 38:21 39:10

shown 25:6,8

shows 32:23 60:13,17

sign 23:10,13 56:7
59:10

sign-up 15:6,15,19
24:19 29:14,17,20 30:4
58:10 59:4,16,21,23
60:1,3,6 61:12,21

62:10,17,24 63:6 64:9

signed 15:25 17:15
18:17 30:24 56:11

signing 15:7 22:4,5
23:2 29:6 56:6,19

simpler 56:9

sir 54:14 75:22 76:1,4

site 21:21

sitting 12:10 41:2
50:12 73:22

size 21:17,25 22:9 33:7
60:25 61:3

sizes 60:21

small 38:16

smaller 22:13,20
61:11,20

smoothly 67:4

software 34:25

Sonsini 6:8 9:9

Sounds 42:15

sources 16:5

space 17:25

spans 39:19

speak 5:24 6:1 9:17,20

speaking 8:15 36:23
70:20 71:12

specific 31:25 49:10
63:20 72:19 75:9

specifically 15:16
17:13 46:15 70:3

speculation 74:4

spell 17:21

spoken 71:20 72:2

spokespeople 70:25

spokesperson 70:21
72:7

stamped 13:19,21

standard 7:16

start 13:12 28:13

state 5:20 6:21 7:2

stated 7:1

statement 70:15 71:7

statements 13:24

States 5:13

stay 53:16

Steno 5:18,19

stenographically 8:5

step 34:2 57:16

steps 67:10

stipulate 6:22

stipulated 5:1

stop 52:10

stopped 54:17

stores 39:22 40:1,10,
13 41:8,12

Street 45:14,17 46:5,25
47:9 48:4 51:4,7,16
52:1,7,17,22 53:1,6
54:25

strings 76:17

structure 26:5

subject 53:14,15 54:1
66:18 67:2

subjects 53:17

submitted 6:4

subscriber 37:15

substance 43:1

Summarizing 45:12

support 44:2 73:2,3

swear 6:12

sworn 7:6

system 33:14 34:21
46:7,9,11 47:22

_____

T

T-A-I 17:25

Tai 17:20 27:18

taking 5:15 8:6 48:2
65:19

**talking** 63:19 67:17

**TECHNICIAN** 5:8,25 6:6,11 42:16,23 66:2,9 75:22 76:1,4,18

**telling** 34:3

**ten** 11:22,23,25 38:10 46:18 63:10,12,14 66:20

**terminate** 67:12

**terms** 11:3,5,8,9,16 12:4,11 22:5 23:17 36:19 38:23 39:9 40:3, 15,22 41:3,6,16,23 42:5,7,10 43:6,8 44:7,9, 23,24 45:3 47:3,6 48:1, 10,14,22 49:13 50:3,4, 8,13,16,18,21 51:18,23 54:22 55:4 56:21 58:5, 7,12,19,23 59:1 61:13, 20 62:14 67:23 68:21 69:22 73:7,15,23 74:8, 11,14 75:16

**tested** 61:25

**testified** 7:6 56:10

**testify** 7:22

**testimony** 43:2

**text** 22:21 23:2,3 33:3

**that'll** 49:22

**thing** 13:16 72:11

**things** 7:16 35:9 67:8

**thinking** 26:21

**third-party** 73:2

**time** 5:5,9 11:9 15:8 16:14 17:15 18:3,15,17 19:21 20:24 29:7 37:9 42:17,23,24 43:9,11 47:25 48:9 55:17 56:5, 19 63:5,15,19 65:17 66:3,9,10 76:22,23

**times** 15:24 18:19 44:10 48:14,23 49:3,12 51:10,17,22 54:21 55:3 67:24 68:2,11,21 69:20

**title** 10:8,9,10

**today** 6:4 7:13,19,25 8:6,20 9:15,24 12:10

41:2 45:20 46:25 50:12 52:17 73:22 75:1

**today's** 9:7

**told** 68:2 69:13

**tool** 73:3

**top** 22:15 23:1 36:2

**Townsend** 45:13,16 46:5,25 47:9 48:3 51:4, 7,15 52:1,7,17,22 53:1, 6 54:25

**track** 32:1

**tracked** 31:23

**tracking** 10:17 30:22 31:2,11,12,15,21 32:11 34:1,5,25 37:4 41:11, 14,19

**transcript** 13:20 76:10

**trial** 5:6

**true** 14:18,25 40:12 41:7

**turned** 30:21 31:3

**twenty-second** 10:13

**Twitter** 70:15

**type** 37:19 47:4 60:2

**types** 59:24

**U**

**uh-huhs** 8:10

**UI/UX** 10:17

**unable** 8:19

**undeliverable** 47:18 54:24 70:4

**underneath** 21:5,10 29:3

**understand** 7:19,22,25 13:24 19:7 25:11 26:16 45:25 47:22 52:14 69:22

**understanding** 46:6 47:5 48:12,21 51:9,17, 21

**understood** 8:3

**Unit** 45:17

**United** 5:13

**updated** 11:8 50:6,8, 13,16

**updates** 11:9 50:21

**upload** 55:10,24

**URL** 26:5 32:17,20,21, 22,23 56:4 57:23

**user** 10:17 15:7 18:9,14 23:10,13,18 29:6 31:22 32:2,22 34:3 36:24 39:22 40:2,10 41:8,12, 16 56:18 57:4 58:9,16 61:4,12 65:9

**user's** 56:22

**users** 31:2,5,8,13,16 32:1 41:22 42:4,7,9

**utilities** 53:5

**UX** 10:21

**V**

**vague** 26:16

**Vagueness** 39:3

**venued** 5:12

**verbatim** 68:1

**verify** 14:17,24 18:22

**version** 10:13 16:6,13 17:14,16 18:23 55:8,10, 15,17

**versus** 5:11 59:18 76:21

**vice** 10:9 64:25

**video** 5:16 75:22,24 76:15,16

**viewed** 32:14 39:22 40:1,3,10,13,14,22 41:3,5,8,12,16 42:7 73:15,23

**viewing** 61:12

**visible** 56:22 57:6 58:5, 8 59:4,7 60:3

**Volume** 76:20

**W**

**Wade-scott** 5:22 6:2 7:11,12 11:1 12:9,15,20 13:19 14:2,4,20 15:13 16:18,25 17:10 18:7 19:3,9 20:4,9,18,22 21:2,9,15,20 22:3,12, 19,25 23:9,15,22 24:3, 7,16 25:4,13,25 26:6, 10,17 27:11,23 28:8,14, 20,25 29:13,19 30:8 31:7,14,20 32:4 33:1,22 34:11,19 35:6,15,20 36:9,15,22 37:6,11,13, 18,24 38:4,9,15,20 39:1,5,7,14 40:7,20 41:1,13,21 42:3,13,25 43:21 44:16,20,22 46:2, 23 47:7,15,24 48:8 49:1,15,21 50:11,22 51:13 52:5,15,20 53:4, 9,18 54:11,16 55:7,16, 23 56:17 57:1,10,15,24 58:4,15,22 59:2,8,13 60:11,19,24 61:10,17, 24 62:4,9,13,22 63:2,9, 18,24 64:4,12,20 65:4, 8,14,19 66:25 67:16 68:5,9,22 69:3,12,17,25 70:8,13,19,24 71:4,10, 17,25 72:5,10 73:12,21 74:2,5,15 75:20 76:2

**wait** 8:14 76:14

**waived** 5:3

**Wayback** 16:2,5 18:21, 24 19:2

**ways** 32:1

**web** 20:3,10,11 26:15 27:1,3 61:1,4

**website** 10:22 24:20 26:2 37:8 57:13,18 58:16 60:5

**width** 33:4 35:9 37:1

**Wilson** 6:7 9:9

**window** 33:8

**word** 73:1

**worded** 14:23

**work**  10:6,16,17,18,19
11:19,24 52:16,19 65:5,
9

**worked**  28:18 63:5
64:16

**working**  17:18

**works**  10:22 64:16

**world's**  21:16,22

**writing**  6:5

**written**  45:13

---

### Y

---

**year**  28:2,5

**years**  10:12 15:23
62:21 63:20

**yeses**  8:9

**Yup**  45:10

---

### Z

---

**zoom**  5:16 61:18

**zoomed**  61:16